GORSUCH, Circuit Judge,
concurring.
There’s an elephant in the room with us today. We have studiously attempted to work our way around it and even left it unremarked. But the fact is Chevron and Brand X permit executive bureaucracies to swallow huge amounts of core judicial and legislative power and concentrate federal power in a way that seems more than a little difficult to square with the Constitution of the framers’ design. Maybe the time has come to face the behemoth.
In enlightenment theory and hard won experience under a tyrannical king the founders found proof of the wisdom of a government of separated powers. In the avowedly political legislature, the framers endowed the people’s representatives with the authority to prescribe new rules of general applicability prospectively. In the executive, they placed the task of ensuring the legislature’s rules are faithfully executed in the hands of a single person also responsive to the people. And in the judiciary, they charged individuals insulated from political pressures with the job of interpreting the law and applying it retroactively to resolve past disputes. This allocation of different sorts of power to different sorts of decisionmakers was no accident. To adapt the law to changing circumstances, the founders thought, the collective wisdom of the people’s representatives is needed. To faithfully execute the laws often demands the sort of vigor hard to find in management-by-committee. And to resolve cases and controversies over past events calls for neutral de-cisionmakers who will apply the law as it is, not as they wish it to be.
Even more importantly, the founders considered the separation of powers a vital guard against governmental encroachment on the people’s liberties, including all those later enumerated in the Bill of Rights. What would happen, for example, if the political majorities who run the legislative and executive branches could decide cases and controversies over past facts? They might be tempted to bend existing laws, to reinterpret and apply them retroactively in novel ways and without advance notice. Effectively leaving parties who cannot alter their past conduct to the mercy of majoritarian politics and risking the possibility that unpopular groups might be singled out for this sort of mistreatment — and raising along the way, too, grave due process (fair notice) and equal protection problems. Conversely, what would happen if politically unresponsive and life-tenured judges were permitted to decide policy questions for the future or try to execute those policies? The very idea of self-government would soon be at risk of withering to the point of pointlessness. It was to avoid dangers like these, dangers the founders had studied and seen realized in their own time, that they pursued the separation of powers. A government of diffused powers, they knew, is a government less capable of invading the liberties of the people. See The Federalist No. 47 (James Madison) (“No political truth is ... stamped with the authority of more enlightened patrons of liberty” than the separation of powers).[1]
*1150 Founders meet Brand X. Precisely to avoid the possibility of allowing politicized decisionmakers to decide cases and controversies about the meaning of existing laws, the framers sought to ensure that judicial judgments “may not lawfully be revised, overturned or refused faith and credit by” the elected branches of government. Chi. & S. Air Lines v. Waterman S.S. Corp., 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948); see also Hayburn’s Case, (2 Dall.) 409, 410 n*, 2 U.S. 408, 1 L.Ed. 436 (1792) (“[B]y the Constitution, neither the Secretary ... nor any other Executive officer, nor even the Legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court.”). Yet this deliberate design, this separation of functions aimed to ensure a neutral decisionmaker for the people’s disputes, faces more than a little pressure from Brand X. Under Brand Xs terms, after all, courts are required to overrule their own declarations about the meaning of existing law in favor of interpretations dictated by executive agencies. Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 982-85, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). By Brand Xs own telling, this means a judicial declaration of the law’s meaning in a case or controversy before it is not “authoritative,” id. at 983, 125 S.Ct. 2688, but is instead subject to revision by a politically accountable branch of government.
That’s exactly what happened to Mr. Padilla-Caldera. First this court read the relevant immigration statutes to permit an alien who has entered the country illegally to seek a discretionary adjustment of status from the Attorney General. Then we remanded the case to allow the Attorney General to make that discretionary decision in Mr. Padilla-Caldera’s case. Padilla-Caldera v. Gonzales (Padilla-Caldera I), 426 F.3d 1294 (10th Cir. 2005), amended and superseded on reh’g by 453 F.3d 1237 (10th Cir. 2006). But instead of undertaking that task, the BIA interpreted the statutory scheme to reach the opposite conclusion we had, applied its new statutory interpretation to Mr. Padilla-Caldera, and held him categorically forbidden from receiving a discretionary adjustment of status. See Padilla-Caldera v. Holder (Padilla-Caldera II), 637 F.3d 1140, 1143-44 (10th Cir. 2011). When the case returned to this court, we conceded that the relevant statutes were indeed ambiguous and acknowledged that Brand X required us to defer to the BIA’s new interpretation, in the end holding that Mr. Padilla-Caldera was, as the agency said, categorically prohibited from applying for a discretionary adjustment of status. Id. at 1147-53. Quite literally then, after this court declared the statutes’ meaning and issued a final decision, an executive agency was permitted to (and did) tell us to reverse our decision like some sort of super court of appeals. If that doesn’t qualify as an unconstitutional revision of a judicial declaration of the law by a political branch, I confess I begin to wonder whether we’ve forgotten what might.
Of course, since Padilla-Caldera we have reentered the field and sought to tame some of Brand Xs more exuberant consequences. So, for example, in De Niz Robles and now again today we have held that an agency’s revision of a judicial decision of what the law is may bear only prospective effect, governing only future cases and controversies. As a result, an executive agency may no longer revise a judicial decision about the law’s meaning with retroactive effect, like the BIA managed to do in the case of Mr. Padilla- *1151 Caldera. No doubt that addresses some of the due process and equal protection problems that follow from allowing politicized decisionmakers to decide cases and controversies about the meaning of existing law.
But even this doesn’t fully resolve the problem. When the political branches disagree with a judicial interpretation of existing law, the Constitution prescribes the appropriate remedial process. It’s called legislation. Admittedly, the legislative process can be an arduous one. But that’s no bug in the constitutional design: it is the very point of the design. The framers sought to ensure that the people may rely on judicial precedent about the meaning of existing law until and unless that precedent is overruled or the purposefully painful process of bicameralism and presentment can be cleared. Indeed, the principle of stare decisis was one “entrenched and revered by the framers” precisely because they knew its importance “as a weapon against ... tyranny.” Michael B.W. Sinclair, Anastasoff Versus Hart: The Constitutionality and Wisdom of Denying Precedential Authority to Circuit Court Decisions, 64 II. Pitt. L. Rev. 695, 707 (2003). Yet even as now semi-tamed (at least in this circuit), Brand X still risks trampling the constitutional design by affording executive agencies license to overrule a judicial declaration of the law’s meaning prospectively, just as legislation might — and all without the inconvenience of having to engage the legislative processes the Constitution prescribes. A form of Lawmaking Made Easy, one that permits all too easy intrusions on the liberty of the people.[2]
Of course, Brand X asserts that its rule about judicial deference to executive revisions follows logically “from Chevron itself.” 545 U.S. at 982, 125 S.Ct. 2688. And that assessment seems fair enough as far as it goes. If you accept Chevron’s claim that legislative ambiguity represents a license to executive agencies to render authoritative judgments about what a statute means, Brand Xs rule requiring courts to overturn their own contrary judgments does seem to follow pretty naturally.
But acknowledging this much only brings the colossus now fully into view. In the Administrative Procedure Act (APA), Congress vested the courts with the power to “interpret ... statutory provisions” and overturn agency action inconsistent with those interpretations. 5 U.S.C. § 706. Congress assigned the courts much the same job in the immigration field where we happen to find ourselves today. 8 U.S.C. § 1252(a)(2)(D). And there’s good reason to think that legislative assignments like these are often constitutionally compelled. After all, the question whether Congress has or hasn’t vested a private legal right in an individual “is, in its nature, judicial, and must be tried by the judicial authority.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 167, 2 L.Ed. 60 (1803); Stern, 564 U.S. at 494-95, 131 S.Ct. 2594.[3] Yet, rather than *1152 completing the task expressly assigned to us, rather than “interpret[ing] ... statutory provisions,” declaring what the law is, and overturning inconsistent agency action, Chevron step two tells us we must allow an executive agency to resolve the meaning of any ambiguous statutory provision. In this way, Chevron seems no less than a judge-made doctrine for the abdication of the judicial duty. Of course, some role remains for judges even under Chevron. At Chevron step one, judges decide whether the statute is “ambiguous,” and at step two they decide whether the agency’s view is “reasonable.” But where in all this does a court interpret the law and say what it is? When does a court independently decide what the statute means and whether it has or has not vested a legal right in a person? Where Chevron applies that job seems to have gone extinct.
Transferring the job of saying what the law is from the judiciary to the executive unsurprisingly invites the very sort of due process (fair notice) and equal protection concerns the framers knew would arise if the political branches intruded on judicial functions. Under Chevron the people aren’t just charged with awareness of and the duty to conform their conduct to the fairest reading of the law that a detached magistrate can muster. Instead, they are charged with an awareness of Chevron-, required to guess whether the statute will be declared “ambiguous” (courts often disagree on what qualifies); and required to guess (again) whether an agency’s interpretation will be deemed “reasonable.” Who can even attempt all that, at least without an army of perfumed lawyers and lobbyists? And, of course, that’s not the end of it. Even if the people somehow manage to make it through this far unscathed, they must always remain alert to the possibility that the agency will reverse its current view 180 degrees anytime based merely on the shift of political winds and still prevail. Neither, too, will agencies always deign to announce their views in advance; often enough they seek to impose their “reasonable” new interpretations only retroactively in administrative adjudications. Perhaps allowing agencies rather than courts to declare the law’s meaning bears some advantages, but it also bears its costs. And the founders were wary of those costs, knowing that, when unchecked by independent courts exercising the job of declaring the law’s meaning, executives throughout history had sought to exploit ambiguous laws as license for their own prerogative. See, e.g., Philip Hamburger, Is Administrative Law Unlawful? 287-91 (2014) (recounting James I’s effort to claim the right to interpret statutes, an effort rejected by the courts in a campaign Roscoe Pound called a “valiant fight” that confirmed the “supremacy of law”).
Some claim to see a way out of our apparent predicament. They suggest that Chevron isn’t so much about permitting agencies to assume the judicial function of interpreting-the law as it.is about permitting agencies to make the law, to effect their own preferences about optimal public policy when a statute is ambiguous. On this account, Chevron’s rule of deference isn’t about trying to make judges out of agencies or letting them usurp the judicial function. Rather, it’s about letting agencies fill legislative voids. When Congress passes ambiguous legislation, Chevron means we should read that as signaling a legislative “intention” to “delegate” to the executive the job of making any reasonable “legislative” policy choices it thinks wise. And, to be sure, Chevron itself espouses just this view. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 862, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In both De Niz Robles and again today we expressly acknowledge as much.
But however that may be, none of it rescues us from our riddle. For whatever *1153 the agency may be doing under Chevron, the problem remains that courts are not fulfilling their duty to interpret the law and declare invalid agency actions inconsistent with those interpretations in the cases and controversies that come before them. A duty expressly assigned to them by the APA and one often likely compelled by the Constitution itself. That’s a problem for the judiciary. And it is a problem for the people whose liberties may now be impaired not by an independent decision-maker seeking to declare the law’s meaning as fairly as possible — the decisionmaker promised to them by law — but by an avowedly politicized administrative agent seeking to pursue whatever policy whim may rule the day. Those problems remain uncured by this line of reply.
Maybe as troubling, this line of reply invites a nest of questions even taken on its own terms. Chevron says that we should infer from any statutory ambiguity Congress’s “intent” to “delegate” its “legislative authority” to the executive to make “reasonable” policy choices. See id. at 843-44, 104 S.Ct. 2778. But where exactly has Congress expressed this intent? Trying to infer the intentions of an institution composed of 535 members is a notoriously doubtful business under the best of circumstances.[4] And these are not exactly the best of circumstances. Chevron suggests we should infer an intent to delegate not because Congress has anywhere expressed any such wish, not because anyone anywhere in any legislative history even hinted at that possibility, but because the legislation in question is silent (ambiguous) on the subject. Usually we’re told that “an agency literally has no power to act ... unless and until Congress confers power upon it.” La. Pub. Serv. Comm’n v. FCC, 476 U.S. 355, 374, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986). Yet Chevron seems to stand this ancient and venerable principle nearly on its head.
Maybe worse still, Chevron’s inference about hidden congressional intentions seems belied by the intentions Congress has made textually manifest. After all and again, in the APA Congress expressly vested the courts with the responsibility to “interpret ... statutory provisions” and overturn agency action inconsistent with those interpretations. 5 U.S.C. § 706. Meanwhile not a word can be found here about delegating legislative authority to agencies. On this record, how can anyone fairly say that Congress “intended” for courts to abdicate their statutory duty under § 706 and instead “intended” to delegate away its legislative power to executive agencies? The fact is, Chevron’s claim about legislative intentions is no more than a fiction' — and one that requires a pretty hefty suspension of disbelief at that.
Even supposing, too, that we could overlook this problem — even supposing we somehow had something resembling an authentic congressional delegation of legislative authority — you still might wonder; can Congress really delegate its legislative authority — its power to write new rules of general applicability — to executive agencies? The Supreme Court has long recognized that under the Constitution “congress cannot delegate legislative power to the president” and that this “principle [is] universally recognized as vital to the integrity and maintenance of the system of government ordained by the constitution.” Marshall Field & Co. v. Clark, 143 U.S. 649, 692, 12 S.Ct. 495, 36 L.Ed. 294 (1892). Yet on this account of Chevron we’re ex *1154 amining, its whole point and purpose seems to be exactly that — to delegate legislative power to the executive branch.
Not only is Chevron’s purpose seemingly at odds with the separation of legislative and executive functions, its effect appears to be as well. While the line between legislative and executive functions may sometimes be murky, history does teach us a couple of things about that line. First, we know that, consistent with the separation of powers, Congress may condition the application of a new rule of general applicability on factual findings to be made by the executive (so, for example, forfeiture of assets might be required if the executive finds a foreign country behaved in a specified manner). See Cargo of the Brig Aurora v. United States, 11 U.S. (7 Cranch) 382, 388, 3 L.Ed. 378 (1813). Second, we -know Congress may allow the executive to resolve “details” (like, say, the design of an appropriate tax stamp). See In re Kollock, 165 U.S. 526, 533, 17 S.Ct. 444, 41 L.Ed. 813 (1897). Yet Chevron pretty clearly involves neither of these kinds of executive functions and, in this way and as a historical matter, appears instead to qualify as a violation of the separation of powers. See Michigan v. EPA, — U.S.-, 135 S.Ct. 2699, 2713-14, 192 L.Ed.2d 674 (2015) (Thomas, J., concurring); cf. City of Arlington v. FCC, — U.S. -, 133 S.Ct. 1863, 1877-79, 185 L.Ed.2d 941 (2013) (Roberts, C.J., dissenting); Nichols, 784 F.3d at 671-72 (Gorsuch, J., dissenting from the denial of rehearing en banc).
Of course, in relatively recent times the Court has relaxed its approach to claims of unlawful legislative delegation. It has suggested (at least in the civil arena) that Congress may allow the executive to make new rules of general applicability that look a great deal like legislation, so long as the controlling legislation contains an “intelligible principle” that “clearly delineates the general policy” the agency is to apply and “the boundaries of [its] delegated authority.” Mistretta v. United States, 488 U.S. 361, 372-73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (internal quotation marks omitted). This means Congress must at least “provide substantial guidance on setting ... standards that affect the entire national economy.” Whitman v. Am. Trucking Ass’n, 531 U.S. 457, 475, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001); cf. Touby v. United States, 500 U.S. 160, 165-67, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991) (suggesting a heightened standard might apply in the criminal setting). Some thoughtful judges and scholars have questioned whether standards like these serve as much as a protection against the delegation of legislative authority as a license for it, undermining the separation between the legislative and executive powers that the founders thought essential.[5]
But even taking the forgiving intelligible principle test as a given, it’s no small question whether Chevron can clear it. For if an agency can enact a new rule of general applicability affecting huge swaths of the national economy one day and reverse itself the next (and that is exactly what Chevron permits, see 467 U.S. at 857-59, 104 S.Ct. 2778), you might be forgiven for asking: where’s the “substantial guidance” in that? And if an agency can interpret the scope of its statutory jurisdiction one way one day and reverse itself the next (and that is exactly what City of Arlington’s application of Chevron says it can), you might well wonder; where are the promised “clearly delineated boundaries” of *1155 agency authority? The Supreme Court once unanimously declared that a statute affording the executive the power to write an industrial code of competition for the poultry industry violated the separation of powers. A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 537-42, 55 5.Ct. 837, 79 L.Ed. 1570 (1935). And if that’s the case, you might ask how is it that Chevron — a rule that invests agencies with pretty unfettered power to regulate a lot more than chicken — can evade the chopping block.[6]
Even under the most relaxed or functionalist view of our separated powers some concern has to arise, too, when so much power is concentrated in the hands of a single branch of government. See The Federalist No. 47 (James Madison) (“The accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny.”). After all, Chevron invests the power to decide the meaning of the law, and to do so with legislative policy goals in mind, in the very entity charged with enforcing the law. Under its terms, an administrative agency may set and revise policy (legislative), override adverse judicial determinations (judicial), and exercise enforcement discretion (executive). Add to this the fact that today many administrative agencies “wield[ ] vast power” and are overseen by political appointees (but often receive little effective oversight from the chief executive to whom they nominally report), and you have a pretty potent mix. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 499, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).[7] Under any conception of our separation of powers, I would have thought powerful and centralized authorities like today’s administrative agencies would have warranted less deference from other branches, not more. None of this is to suggest that Chevron is “the very definition of tyranny.” But on any account it certainly seems to have added prodigious new powers to an already titanic administrative state — and spawned along the way more than a few due process and equal protection problems of the sort documented in the court’s opinion today and in De Niz Robles. It’s an arrangement, too, that seems pretty hard to square with the Constitution of the founders’ design and, as Justice Frankfurter once observed, “[t]he accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions” imposed by the Constitution. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring).
What I suspect about Chevron’s compatibility with the separation of powers finds confirmation in what I know. The Supreme Court has expressly instructed us not to apply Chevron deference when an agency seeks to interpret a criminal statute. Why? Because, we are seemingly told, doing so would violate the Constitution by forcing the judiciary to abdicate the job of saying what the law is and preventing courts from exercising independent judgment in the interpretation of statutes. See, e.g., Abramski v. United States, — U.S. -, 134 S.Ct. 2259, 2274, 189 L.Ed.2d 262 (2014) *1156 (“Whether the Government interprets a criminal statute too broadly ... or too narrowly ... a court has an obligation to correct its error.”). An admirable colleague has noted that the same rationale would appear to preclude affording Chevron deference to agency interpretations of statutes that bear both civil and criminal applications. See, e.g., Esquivel-Quintana v. Lynch, 810 F.3d 1019, 1027-32 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part); Carter v. Welles-Bowen Realty, Inc., 736 F.3d 722, 729-36 (6th Cir. 2013) (Sutton, J., concurring). A category that covers a great many (most?) federal statutes today. And try as I might, I have a hard time identifying a principled reason why the same rationale doesn’t also apply to statutes with purely civil application. 'After all, the APA doesn’t distinguish between purely civil and other kinds of statutes when describing the interpretive duties of courts. Neither did the founders reserve their concerns about political deci-sionmakers deciding the meaning of existing law to criminal cases; Article III doesn’t say judges should say what the law is or decide whether legal rights have or haven’t vested and been violated only when a crime is alleged. And certainly Marbury did not speak so meekly: it affirmed the judiciary’s duty to say what the law is in a case that involved the interpretation of, yes, a civil statute affecting individual rights.
Some have suggested that criminal statutes should be treated differently when it comes to Chevron because they are not “administered” by an agency. See Gonzales v. Oregon, 646 U.S. 243, 264-65, 126 S.Ct. 904, 163 L.Ed.2d 748 (2006). I take this as a roundabout way of suggesting that Congress hasn’t “delegated” its legislative authority in the criminal context like it has in the civil. But as we’ve seen, the claim that Congress has delegated legislative authority even in the civil context is no more than a fiction. And for that matter it’s hard to see why the Justice Department doesn’t “administer” criminal statutes in much the same way other agencies “administer” various civil statutes. See, e.g., Crandon v. United States, 494 U.S. 152, 177, 110 S.Ct. 997, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring in the judgment) (acknowledging that “[t]he Justice Department ... has a very specific responsibility to determine for itself what this statute means, in order to decide when to prosecute”). Of course, criminal law enforcement takes place in the courts, not before administrative agencies. But often enough civil administrative actions also depend on court approval for their effectiveness, and as we’ve seen this may be a matter not merely of statutory but sometimes constitutional imperative. See 5 U.S.C. § 706; Caust-Ellenbogen, supra, at 816; see also supra at 1151.
Other arguments for rejecting Chevron deference (only) in criminal matters seem equally shaky. Some suggest that principles of due process and equal protection demand that the criminal law be clear and clearly given by judges. Others suggest that prosecutorial agencies have too many incentives to interpret criminal statutes expansively. But while concerns about due process and fair notice surely reach their apex in the criminal context, I am uncertain why we would view that as a license to neglect attending to them in the civil context. See Clinton v. City of New York, 524 U.S. 417, 450, 118 S.Ct. 2091, 141 L.Ed.2d 393 (1998) (Kennedy, J., concurring) (“Liberty is always at stake when one or more of the branches seek to transgress the separation of powers.”). Especially given the power our modern administrative state already enjoys, even without Chevron, to penalize persons in ways that can destroy their livelihoods and intrude on their liberty even when exercising only purely civil powers. See Free Enter. Fund, 561 U.S. at 499, 130 S.Ct. 3138. And given that the line *1157 between “criminal” and “civil” statutes has often proven tricky enough to administer. See, e.g., Hudson v. United States, 522 U.S. 93, 99-100, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997) (suggesting the use of a balancing test composed of seven non-exclusive factors to tell the difference between civil and criminal statutory penalties). Neither, too, are prosecutorial agencies known to be alone in their capacity and willingness to interpret statutes aggressively. See, e.g., Michigan, 135 S.Ct. at 2713 (Thomas, J., concurring) (“[W]e should be alarmed that [the agency] felt sufficiently emboldened by those precedents to make the bid for deference that it did here.”); Talk Am., Inc. v. Mich. Bell Tel. Co., 564 U.S. 50, 69, 131 S.Ct. 2254, 180 L.Ed.2d 96 (2011) (Sca-lia, J., concurring) (noting that the FCC “has repeatedly been rebuked in its attempts to expand the statute beyond its text, and has repeatedly sought new means to the same ends”).
Beyond all that, Chevron has presented its fair share of practical problems in its administration. By way of illustration, consider just two examples. First, we once thought Chevron’s presumption of delegation for ambiguous statutes applied uniformly to Congress’s work. Then we learned it doesn’t apply to criminal statutes. Now we know it doesn’t always apply even when it comes to purely civil statutes. In United States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Court added a “step zero” to the Chevron sequence, one that requires courts to employ a multi-factor balancing test to decide whether to proceed to apply Chevron to a civil statute. See id. at 227-31, 121 S.Ct. 2164. So today courts will only sometimes apply Chevron deference to ambiguous civil statutes. Neither, respectfully, does looking to the Supreme Court’s case law supply a great deal of guidance on how to apply Mead’s balancing test. In recent years, the Court has declined to apply Chevron deference to arguably ambiguous civil statutes but it has only sometimes cited the Mead balancing test as the reason, leaving more than a few litigants and lower courts to wonder how they are supposed to proceed.[8]
Second, long lingering questions linger still about just how rigorous Chevron step one is supposed to be. In deciding whether Congress has “directly spoken” to a question or left it “ambiguous,” what materials are we to consult? The narrow language of the statute alone? Its structure and history? Canons of interpretation? Committee reports? Every scrap of legislative history we can dig up? Some claim to have identified at least three potential variants of Chevron jurisprudence governing the line between step one and step two in the Supreme Court’s case law.[9]
Of course, we often retain even mistaken judicial decisions because reliance interests have arisen around them. But Chevron is a procedural rule, and procedural rules generally receive little precedential consideration when experience proves them proble *1158 matic in their administration. Payne v. Tennessee, 501 U.S. 808, 828, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). No doubt this is because parties form reliance interests primarily around substantive rules of law that allocate property and define the limits of permitted behavior, while procedural rules merely govern how courts will go about their own business when deciding disputes many years later that parties often cannot foresee when arranging their affairs. And it is particularly hard to see how Chevron might have engendered serious reliance interests by individuals (if not agencies). Not only because of the uncertainties associated with its administration. But because even when clearly and properly implemented, Chevron's very point is to permit agencies to upset the settled expectations of the people by changing policy direction depending on the agency’s mood at the moment. So if reliance interests count, they would seem to count against retaining Chevron.
All of which raises this question: what would happen in a world without Chevron? If this goliath of modern administrative law were to fall? Surely Congress could and would continue to pass statutes for executive agencies to enforce. And just as surely agencies could and would continue to offer guidance on how they intend to enforce those statutes. The only difference would be that courts would then fulfill their duty to exercise their independent judgment about what the law is. Of course, courts could and would consult agency views and apply the agency’s interpretation when it accords with the best reading of a statute. But de novo judicial review of the law’s meaning would limit the ability of an agency to alter and amend existing law. It would avoid the' due process and equal protection problems of the kind documented in our decisions. It would promote reliance interests by allowing citizens to organize their affairs with some assurance that the rug will not be pulled from under them tomorrow, the next day, or after the next election. And an agency’s recourse for a judicial declaration of the law’s meaning that it dislikes would be precisely the recourse the Constitution prescribes — an appeal to higher judicial authority or a new law enacted consistent with bicameralism and presentment. We managed to live with the administrative state before Chevron. We could do it again. Put simply, it seems to me that in a world without Chevron very little would change — except perhaps the most important things.

. See also, e.g., The Federalist No. 78 (Alexander Hamilton) (''[LJiberty can have nothing to fear from the Judiciary alone” but “ha[s] everything to fear from [the] union” of the judicial and legislative functions.); Stern v. Marshall, 564 U.S. 462, 483, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011) (noting that "the framers considered it essential” to liberty to keep the executive and judiciary and the legislature and judiciary "truly distinct” (internal quotation marks omitted)); M. J. C. Vile, Constitutionalism and the Separation of Powers 168-69 (2d ed. 1998); Neil M. Gorsuch, Of Lions *1150 and Bears, Judges and Legislators, and the Legacy of Justice Scalia, 66 Case W. Res. L. Rev. 905, 912 (2016).

. See John F. Manning, Lawmaking Made Easy, 10 Green Bag 2d 191, 202 (2007); see also Dep’t of Transp. v. Ass'n of Am. R.Rs.,U.S.-, 135 S.Ct. 1225, 1237, 191 L.Ed.2d 153 (Alito, J., concurring); United States v. Nichols, 784 F.3d 666, 670 (10th Cir. 2015) (Gorsuch, J., dissenting from the denial of rehearing en banc).

. See also Wellness Int’l. Network, Ltd. v. Sharif, -U.S. -, 135 S.Ct. 1932, 1965, 191 L.Ed.2d 911 (2015) (Thomas, J., dissenting); The Federalist No. 78 (Alexander Hamilton) (“The interpretation of the laws is the proper and peculiar province of the courts” and it “belong[s] to [judges] to ascertain ... the meaning of any particular act proceeding from the [ljegislative body.”); Robert H. Jackson, Problems of Statutory Interpretation, 8 F.R.D. 121, 123 (1948) ("Legislation is shaped by a majority ... [b]ut when a ruling majority has put its commands in statutory form ... the interpretation of their fair meaning and their application to individual cases should be made by judges as independent of politics as humanly possible....”).

. See, e.g., Lexington Ins. Co. v. Precision Drilling Co., 830 F.3d 1219, 1221-22, No. 15-8036, 2016 WL 3999896, at *2 (10th Cir. July 26, 2016); Kenneth A. Shepsle, Congress Is a “They,” Not an “It”: Legislative Intent as Oxymoron, 12 Int'l Rev. L. & Econ. 239, 244-45 (1992).

. See, e.g., Ass’n of Am. R.Rs., 135 S.Ct. at 1246 (Thomas, J., concurring in the judgment); Mistretta, 488 U.S. at 415-16, 109 S.Ct. 647 (Scalia, J., dissenting); Gary Lawson, Delegation and Original Meaning, 88 Va. L. Rev. 327, 329 (2002) (asserting that the Court has “found intelligible principles where less discerning readers find gibberish”).

. See Sanford N. Caust-Ellenbogen, Blank Checks: Restoring the Balance of Powers in the Post-Chevron Era, 32 B.C. L. Rev. 757, 774 (1991) (Chevron “upsets the balance created by the Supreme Court in its nondelegation doctrine. It is one thing for Congress to set policy at an abstract level and delegate specific implementation to the agency. It is quite another thing for Congress to delegate policy-setting to the agency.”).

. See also City of Arlington, 133 S.Ct. at 1877-78 (Roberts, C.J., dissenting); Elena Kagan, Presidential Administration, 114 Harv. L. Rev. 2245, 2250 (2001); Stephen Breyer, Making Our Democracy Work 109-10 (2010).

. See, e.g., PGA Tour, Inc. v. Martin, 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001); see also William N. Eskridge, Jr. & Lauren E. Baer, The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from Chevron to Hamdan, 96 Geo. L.J. 1083, 1097-1120 (2008).

. See, e.g., Jack M. Beerman, End the Failed Chevron Experiment Now: How Chevron Has Failed and Why It Can and Should Be Overruled, 42 Conn. L. Rev. 779, 817-22 (2010); see also Chevron, 467 U.S. at 842, 104 S.Ct. 2778 (resolving a case under step one only if "Congress has directly spoken to the precise question at issue”); INS v. Cardoza-Fonseca, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987) ("[e]mploying traditional tools of statutory construction”); Dole v. United Steelworkers of Am., 494 U.S. 26, 35, 110 S.Ct. 929, 108 L.Ed.2d 23 (1990) (same); MCI Telecomms. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 225-27, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) (relying on plain meaning only).