Judge Voros, dissenting:
 

 ¶ 39 I respectfully dissent. The majority opinion employs the absurdity doctrine to override the plain meaning of section 201 on the ground that it would yield a result so overwhelmingly absurd that no rational legislator could have intended it. But the claimed absurd result-that Utah would enjoy rights of way granted by the United States without a judicial remedy for quieting title to them against the United States-was the prevailing law nationwide for 106 years, from the passage of the Mining Act in 1866 until the passage of the Quiet Title Act in 1972.
 

 ¶ 40 For this reason, I believe the majority opinion represents the most expansive application of the absurdity doctrine in American law. I am unaware of the absurdity doctrine ever being employed, in Utah or elsewhere, to reject as absurd not a
 
 proposed
 
 rule of law, but a
 
 long-existing
 
 rule of law-in this case, a rule of law governing all American states and territories for over a century. If that rule of law in fact mandated absurd results, surely in 106 years some court somewhere would have noticed. Yet no party cites, nor am I able to discover, any court questioning the rationality of the rule of law that we today declare absurd.
 

 ¶ 41 That said, I agree with much of the majority opinion. I agree with Part I insofar as it concludes that questions concerning the Quiet Title Act's twelve-year statute of limitations and the applicability of article XX of the Utah Constitution exceed the scope of the certified question. And I agree with the majority's conclusion in Part II that the plain language of section 201 and its predecessor unmistakably renders them statutes of repose.
 
 [79]
 

 ¶ 42 The federal courts have requested that we determine whether Utah Code section 78B-2-201(1) and its predecessor are statutes of limitations or statutes of repose. I would answer categorically that they are statutes of repose.
 
 [80]
 

 I. The Result Mandated by Section 201 and its Predecessor Is Not Absurd or Even Uncommon
 

 A. The Absurdity Doctrine Is "Strong Medicine."
 

 ¶ 43 The absurdity principle has two branches. "We apply the absurd consequences canon to resolve ambiguities in a statute. If statutory language lends itself to two alternative readings, we choose the reading that avoids absurd consequences."
 
 Utley v. Mill Man Steel, Inc.
 
 ,
 
 2015 UT 75
 
 , ¶ 46,
 
 357 P.3d 992
 
 (Durrant, C.J., concurring in part and dissenting in part) (footnote omitted). "The absurdity doctrine, by contrast, has nothing to do with resolving ambiguities. Rather, we apply this canon to reform unambiguous statutory language where applying the plain language leads to results so overwhelmingly absurd no rational legislator could have intended them."
 

 Id.
 

 (Durrant, C.J., concurring in part and dissenting in part). Invocation of the absurdity doctrine is a "far more momentous step" than invocation
 of the absurd consequences canon.
 
 Id.
 
 ¶ 47 (Durrant, C.J., concurring in part and dissenting in part).
 

 ¶ 44 The absurdity doctrine serves as a crucial safety valve in our system of justice. Nevertheless, it "is a drastic step, one we have described as 'strong medicine, not to be administered lightly.' "
 
 Id.
 
 ¶ 48 (Durrant, C.J., concurring in part and dissenting in part) (citation omitted). Because the text of an unambiguous statute "is almost always irrefutable evidence of the legislature's intent," we will override the plain language under the absurdity doctrine only where the result it mandates is "so overwhelmingly absurd that no rational legislator could have intended the statute to operate in such a manner."
 
 Id.
 
 (Durrant, C.J., concurring in part and dissenting in part).
 

 ¶ 45 "In defining the parameters of what constitutes an absurd result," we have "note[d] the inherent tension in this canon of construction between refraining from blind obedience to the letter of the law that leads to patently absurd ends and avoiding an improper usurpation of legislative power through judicial second guessing of the wisdom of a legislative act."
 
 State ex rel. Z.C.
 
 ,
 
 2007 UT 54
 
 , ¶ 12,
 
 165 P.3d 1206
 
 . "Thus, as is common to all rules of statutory construction, the guiding star of the absurd results doctrine is the intent of the pertinent legislative body, which limits the application of this canon of construction. Rather than controverting legislative power, the absurd results doctrine functions to preserve legislative intent when it is narrowly applied."
 

 Id.
 

 ¶ 46 However, the doctrine is virtually standardless. "Other than the directive that a result must be so absurd that the legislative body which authored the legislation could not have intended it, there is no precise legal standard to determine what legislatures would consider to be an absurd result."
 

 Id.
 

 ¶ 13 (citing Veronica M. Dougherty,
 
 Absurdity and the Limits of Literalism: Defining the Absurd Result Principle in Statutory Interpretation
 
 , 44 AM. U. L. REV. 127, 128 (1994) ). Frequently the determination of absurdity "requires a further reference to a variety of underlying values that are deeply embedded in our legal system and in our culture," Dougherty,
 
 supra
 
 ¶46 at 164-65, or, otherwise stated, "an ill-defined set of background social values identified on an ad hoc basis by the Court," John F. Manning,
 
 The Absurdity Doctrine
 
 , 116 HARV. L. REV . 2387, 2486 (2003). Accordingly, "the difficulty of defining absurdity, and the historical lack of attempts to do so, can ... be explained in part by the fact that the principle represents a collection of values that are fundamental to our legal system, yet seldom made explicit in the course of the principle's application." Dougherty,
 
 supra
 
 ¶46, at 165.
 

 ¶ 47 A relatively non-controversial use of the absurdity doctrine is to correct obvious linguistic errors.
 

 Take the scrivener's error. Sometimes a statute will misspell "third party" as "third partly." Or provide that the "winning party" rather than the "losing party" must pay the other side's reasonable attorney's fees. In cases like these, the error in the statute is so "unthinkable" that any reasonable reader would know immediately both (1) that it contains a "technical or ministerial" mistake, and (2) the correct meaning of the text.
 

 Lexington Ins. Co. v. Precision Drilling Co.
 
 ,
 
 830 F.3d 1219
 
 , 1223 (10th Cir. 2016) (Gorsuch, J., writing for himself alone in this portion of the opinion) (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 235 (2012)).
 

 ¶ 48 But a more substantive use of the doctrine, though legitimate, nevertheless exists in tension with both the doctrine of separation of powers and the textualist approach to statutory interpretation.
 
 See, e.g.
 
 , Manning,
 
 supra
 
 ¶46 at 2391 ("The Constitution's sharp separation of lawmaking from judging reflects a rule-of-law tradition that seeks to preclude legislatures from making ad hoc exceptions to generally worded laws. By asking judges to carve out statutory exceptions on the ground that the legislature would have done so, the absurdity doctrine calls on judges to approximate the very behavior that the norm of separation seeks to forbid.");
 
 id.
 
 at 2392 ("Thus, for those who accept ... the textualists' premises about the legislative process and the constitutional structure, a principled understanding of textualism would
 necessarily entail abandoning the absurdity doctrine."). For example, one federal judge has argued that deploying the absurdity doctrine to overrule plain statutory text would "risk offending the separation of powers by purporting to endow a court with the power to disregard a possible statutory application not because of its linguistic implausibility but because of a judgment about the implausibility of its consequences as a matter of social policy."
 
 Lexington Ins. Co.
 
 ,
 
 830 F.3d at 1222
 
 (Gorsuch, J., writing for himself alone in this portion of the opinion).
 

 ¶ 49 The absurdity that the majority sees in section 201 is not of the non-controversial, linguistic sort. Section 201 is not "linguistically incoherent."
 
 See
 

 United States v. Head
 
 ,
 
 552 F.3d 640
 
 , 643 (7th Cir. 2009),
 
 superseded by statute on other grounds, as recognized by
 

 United States v. Anderson
 
 ,
 
 583 F.3d 504
 
 (7th Cir. 2009). Rather, in the majority's view, it "makes a bad substantive choice,"
 
 see
 
 id.
 

 B. Section 201 Mandates a Rule That Prevailed Throughout the United States For Over a Century.
 

 ¶ 50 Read as written, section 201 does not work an absurd result. The majority asserts that the claimed absurd result flows from the interplay of section 201 and two federal statutes:
 

 Because the earliest the State could have raised a QTA claim was 1972, section 201 and its predecessor ensured that the only R.S. 2477 roads the State could have protected against federal intrusion under the QTA were those obtained in and after 1965-seven years before Congress enacted the QTA. Taken together, these statutes created a regime where the right to protect title to R.S. 2477 rights of way obtained prior to 1965 automatically expired with respect to the federal government before any legal mechanism (the QTA) existed that would have permitted the State to protect its vested title.
 

 Supra
 
 ¶25. The interplay of these three statutes thus leaves the State holding rights of way that are "ephemeral" with respect to the federal government:
 

 The State's inability to protect the property interests granted to it by the federal government has, in turn, rendered the State's R.S. 2477 rights of way inherently ephemeral with respect to the United States; for a property interest that gives its possessor no defensible rights against an adverse party is a property interest in name only.
 

 Supra
 
 ¶28. I agree that this result flows from the interplay of the relevant state and federal statutes. But I do not agree that this result is absurd or even uncommon.
 

 ¶ 51 On the contrary, the result section 201 mandates is and always has been the status of the R.S. 2477 rights of way at issue here. "In 1866, Congress passed an open-ended grant of 'the right of way for the construction of highways over public lands, not reserved for public uses.' "
 
 Southern Utah Wilderness All. v. Bureau of Land Mgmt.
 
 ,
 
 425 F.3d 735
 
 , 740 (10th Cir. 2005) (quoting Act of July 26, 1866, ch. 262, § 8,
 
 14 Stat. 251
 
 , 253, codified at
 
 43 U.S.C. § 932
 
 ,
 
 repealed by
 
 Federal Land Policy Management Act of 1976 (FLPMA), Pub.L. No. 94-579, § 706(a),
 
 90 Stat. 2743
 
 , 2793). "This statute, commonly called 'R.S. 2477,' remained in effect for 110 years, and most of the transportation routes of the West were established under its authority."
 
 Id
 
 ."Originally the doctrine of sovereign immunity barred quiet title actions against the United States."
 
 Knapp v. United States
 
 ,
 
 636 F.2d 279
 
 , 281 (10th Cir. 1980). "Prior to 1972, States and all others asserting title to land claimed by the United States had only limited means of obtaining a resolution of the title dispute-they could attempt to induce the United States to file a quiet title action against them, or they could petition Congress or the Executive for discretionary relief."
 
 Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands
 
 ,
 
 461 U.S. 273
 
 , 280,
 
 103 S.Ct. 1811
 
 ,
 
 75 L.Ed.2d 840
 
 (1983).
 
 [81]
 

 ¶ 52 This history makes clear that the rule of law the majority rejects as irrational and thus absurd is not novel or hypothetical. On the contrary, it has been tried and tested. Our nation lived under it for a century-long enough, I believe, for any irrationality in the rule to emerge.
 

 ¶ 53 But the majority opinion maintains that the absurd result sought to be avoided is not that the State lacks any judicial remedy for quieting title to the State's R.S. 2477 rights of way as against the federal government; on the contrary, the majority is inclined to agree that this result is not absurd.
 
 Supra
 
 ¶31. What is overwhelmingly absurd, the majority reasons, is the fact that the State "can own such property"-R.S. 2477 roads-"only for seven years."
 
 Supra
 
 ¶32. This result, the majority maintains, is "independent of whether the State could have sued the federal government."
 
 Supra
 
 ¶32. Again, I disagree.
 

 ¶ 54 First, as I read it, section 201 says nothing about what property the State can own; like all such statutes, it addresses only when the State can bring suit. Second, for a century federal law prohibited the State from suing the federal government to quiet title to R.S. 2477 rights of way; now section 201 does. I cannot see how a non-absurd result mandated by federal law has become absurd when mandated by state law. The absurdity doctrine does not authorize us to reject the clear meaning of an unambiguous statute merely because that statute prescribes a result that seems to disfavor the State.
 

 ¶ 55 What the majority has labeled an absurd result is nothing more than a missed opportunity. The drafters of section 201 and its remote predecessors might have chosen to draft those statutes as statutes of limitation rather than statutes of repose. Had they known then what we know now-that in 1972 Congress would pass the Quiet Title Act-they may well have done so. It would have been a prescient choice. But "[a] result is not absurd merely because reasonable people viewing a statute with the benefit of hindsight would conclude that the Legislature acted improvidently."
 
 McGhee v. Helsel
 
 ,
 
 262 Mich.App. 221
 
 ,
 
 686 N.W.2d 6
 
 , 8 (2004).
 

 ¶ 56 Finally, no formulation of the absurd results doctrine of which I am aware, in Utah or elsewhere, would allow a court to reject a non-absurd result mandated by a statute on the ground that at some time in the past that statute would have mandated an absurd result. Consequently, whatever the State could or could not have done within any seven-year repose period no longer pertains; that period has expired, leaving the State without a judicial remedy to quiet title to any R.S. 2477 roads against the federal government-leaving the State, in other words, in the same predicament it and every other state and territory was in from 1866 to 1972. Or, more accurately,
 
 almost
 
 the same predicament, for the State has a remedy now that did not exist before 1972.
 

 C. Section 201 and Its Predecessor Do Not Leave the State Without a Remedy.
 

 ¶ 57 The majority opinion reasons that adhering to the plain language of section 201 would be absurd in part because doing so would leave the State with "no legal means to protect its property interests from the very governmental body that granted them."
 
 Supra
 
 ¶26.
 

 ¶ 58 First, based on the analysis in the preceding section, I do not agree that section 201 and its predecessor need to provide an alternative remedy to avoid absurdity. Nevertheless, a party's alternative avenues to vindicate its rights or interests do weigh in the absurdity analysis. In
 
 Marion Energy, Inc. v. KFJ Ranch Partnership
 
 ,
 
 2011 UT 50
 
 , ¶ 26,
 
 267 P.3d 863
 
 , we were asked to invoke the absurd consequences canon, not the absurdity doctrine, but our reasoning there illuminates the question before us here. In
 
 Marion Energy
 
 , an energy company sought to condemn private land for the purpose of building a road to access its leased oil and gas deposits.
 
 Id.
 
 ¶ 1. It relied on a statute
 that granted the right of eminent domain for the building of roads to access "mineral deposits."
 
 Id.
 
 (citation omitted). The question before us was whether the statutory phrase "mineral deposits" encompassed oil and gas deposits.
 
 Id.
 
 ¶ 13. The energy company argued that to read the phrase narrowly would work an absurd result, namely, allowing one private landowner to effectively prevent the School and Institutional Trust Lands Administration "from accessing and exploiting its oil and gas deposits for the benefit of the Trust."
 
 Id.
 
 ¶ 27 (citation omitted).
 

 ¶ 59 We held that the statutory phrase "mineral deposits" did not encompass oil and gas deposits.
 
 Id.
 
 ¶ 31. We reasoned that while a narrow interpretation of the statutory phrase would deprive the energy company of one means of accessing its leased oil and gas deposits-condemnation-the company had other available means of accessing and exploiting them.
 
 Id.
 
 ¶ 28. For example, we noted that the energy company "may have a statutory right to enter" portions of the private property so long as it complied with all statutory requirements.
 
 Id.
 
 ¶ 29. Other alternatives we noted were "securing the written consent or waiver" of the property owner and posting a bond.
 
 Id.
 
 (citation omitted). Of course, none of these alternatives was the equivalent of condemnation; none offered equivalent control and, perhaps more crucially, none guaranteed access-indeed, at least one of the alternatives we listed would have required the energy company to appeal to the absolute discretion of the landowner. We nevertheless concluded, "Because [the company] has alternative avenues of access to its leased mineral rights, we do not believe that it would be absurd to interpret ... the phrase 'mineral deposits' as not encompassing oil and gas."
 
 Id.
 
 ¶ 30.
 

 ¶ 60 Similarly here, reading section 201 and its predecessor according to their plain meaning may well leave the State with no
 
 direct judicial
 
 means to quiet title, but the State does have an alternative
 
 administrative
 
 means under the Federal Land Policy and Management Act to establish or renew its rights of way. Before the passage of FLPMA in 1976, "Congress had enacted a tangled array of laws granting rights-of-way across federal lands. In an effort to untangle these laws and establish a statutory scheme for the management of forest lands, Congress passed the Federal Land Policy and Management Act."
 
 United States v. Jenks
 
 ,
 
 22 F.3d 1513
 
 , 1515-16 (10th Cir. 1994) (citation omitted). "Title V of FLPMA repealed over thirty statutes granting rights-of-way across federal lands and vested the Secretaries of Agriculture and Interior with authority 'to grant, issue, or renew rights of way over [Forest Service and public lands] for ... roads, trails [and] highways' ... subject to reasonable regulation."
 

 Id.
 

 (alterations and first omission in original) (citations omitted).
 

 ¶ 61 Subchapter V of FLPMA authorizes the federal government to grant, issue, or renew rights of way over public lands for reservoirs, pipelines, roads, trails, highways, livestock driveways, and other systems or facilities that are in the public interest and that require rights of way over such lands.
 
 43 U.S.C. § 1761
 
 (a) (2010). In designating right-of-way corridors under FLPMA, the relevant agency must "take into consideration national and State land use policies, environmental quality, economic efficiency, national security, safety, and good engineering and technological practices."
 
 43 U.S.C. § 1763
 
 (2013). One commentator estimates that the "BLM has granted thousands of routes under this formal process." Tova Wolking,
 
 From Blazing Trails to Building Highways: SUWA v. BLM & Ancient Easements over Federal Public Lands
 
 , 34 ECOLOGY L.Q. 1067, 1101 (2007).
 

 ¶ 62 And of course, if a claimant "disagrees with the agency's decision, it may appeal or seek judicial review."
 
 United States v. Garfield County
 
 ,
 
 122 F.Supp.2d 1201
 
 , 1244 (D. Utah 2000). "The court may then review the agency's initial determination in accordance with the provisions of the Administrative Procedure Act."
 

 Id.
 
 See, e.g.
 
 ,
 
 Southern Utah Wilderness All.
 
 ,
 
 425 F.3d at 747
 
 , (stating that the initial determination of whether activity falls within an established right-of-way must be made by the agency and not the court).
 

 ¶ 63 This administrative approach is not so overwhelmingly absurd that no rational legislator could prefer it to litigating hundreds of historic R.S. 2477 claims that depend on
 memories of events that occurred half a century or more earlier.
 
 See, e.g.
 
 ,
 
 San Juan County v. United States
 
 , No. 2:04-CV-0552BSJ,
 
 2011 WL 2144762
 
 , at *23 (D. Utah May 27, 2011) (stating that a witness testified "that he first traveled through Salt Creek Canyon in the spring of 1943, working with his father as a cowboy ... for $25 a month" and another testified "that he began herding cattle ... in Salt Creek Canyon on horseback beginning in 1956"),
 
 aff'd
 
 ,
 
 754 F.3d 787
 
 (10th Cir. 2014). A statutory approach that would bar the State from litigating titles to each of the claimed rights of way and instead would require the State to pursue uncertain administrative remedies or simply leave some or all of the title disputes unresolved may strike some judges as unwise or incongruous. But "[i]f we are to maintain respect for the legislature's policymaking role, and avoid the temptation to substitute our preferences for its decisions, we must not override the statutory text with our sense of good policy in a case in which we deem the statute's formulation merely unwise or incongruous."
 
 Cox v. Laycock
 
 ,
 
 2015 UT 20
 
 , ¶ 72,
 
 345 P.3d 689
 
 (Lee, J., concurring in part).
 

 ¶ 64 In sum, as in
 
 Marion Energy
 
 , the availability of an alternative avenue for the State to enjoy its claimed rights of way over federal land shows that applying section 201 and its predecessor according to their plain meaning does not work an absurd result here.
 
 [82]
 

 D. The 2015 Amendments Do Not Apply.
 

 ¶ 65 The State contends that two 2015 amendments to Title 78B "compel the conclusion that the statute is one of limitations, not repose."
 
 [83]
 

 ¶ 66 House Bill 401 created a new section 78B-2-118. The new section addresses actions against only one party, the federal government. It provides that suits against the federal government under the Quiet Title Act never expire:
 

 Actions against the federal government regarding real property and that are subject to the federal Quiet Title Act, 28 U.S.C. Sec. 2409a, do not expire under this chapter.
 

 UTAH CODE § 78B-2-118 (2015). The legislation specifies, "This bill has retrospective operation to October 25, 1972."
 
 2015 Utah Laws 324
 
 .
 

 ¶ 67 House Bill 1001 renumbered the existing section 201 as subsection 201(1) and added a new subsection (2). The new subsection (2) describes the new subsection (1) (the old section 201) as a "statute of limitations":
 

 The statute of limitations in this section runs from the date on which the state or those from whom it claims received actual notice of the facts giving rise to the action.
 

 UTAH CODE § 78B-2-201(2). The legislation specified, "This bill has retrospective operation to March 12, 1953." 2015 Utah Laws 1st Spec. Sess. 2806.
 

 ¶ 68 SUWA sees "three fatal flaws" in the State's argument based on the 2015 amendments. First, SUWA argues, application of these amendments would impair existing rights by reviving time-barred claims. Second, it argues, the Supremacy Clause of the United States Constitution prohibits state laws that discriminate against the United States. And third, SUWA argues, "the Utah Legislature is constitutionally prohibited from 'attempt[ing] to determine the outcome of a particular case by passage of a law intended to accomplish such a purpose.' " (Quoting
 
 Foil v. Ballinger
 
 ,
 
 601 P.2d 144
 
 , 151 (Utah 1979) ).
 

 ¶ 69 The timing and text of the bills reveal that the amendments were aimed at pending R.S. 2477 litigation. This conclusion is reinforced by the floor debate on House Bill
 1001.
 
 [84]
 
 The sponsor of House Bill 1001 cited the certification question now pending before this court, stating that three federal judges "certified this to come to the ... Supreme Court of the State of Utah and ask for clarification on this law." The sponsor further stated, "If the assertion is correct by SUWA then these cases would all be barred." The amendment, the sponsor explained, "only affects one particular action."
 
 [85]
 
 And although a senator during floor debate questioned whether it was wise to "have the legislature jump into a current court case," no one questioned the premise of his question.
 
 [86]
 
 Indeed, in its briefing the State acknowledges that " section 78B-2-201 continues to apply to claims by the State with respect to a right or interest in real property in all other contexts
 
 except
 
 the one presented in these cases."
 

 ¶ 70 These amendments do not alter my analysis of the character of section 201 and its predecessor, because applying the 2015 amendments to the present litigation would impair vested rights while impermissibly allowing the Legislature to determine the outcome of a particular case.
 

 ¶ 71 "A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive." UTAH CODE § 68-3-3 (2010). Even then, other limits may apply. One such limit precludes retroactive amendments that would impair vested rights.
 

 ¶ 72 "We have often stated that retroactive application is permissible if the amended version of the statute '[does] not enlarge, eliminate, or destroy vested or contractual rights.' "
 
 Harvey v. Cedar Hills City
 
 ,
 
 2010 UT 12
 
 , ¶ 14,
 
 227 P.3d 256
 
 (alteration in original) (quoting
 
 Dep't of Soc. Servs. v. Higgs
 
 ,
 
 656 P.2d 998
 
 , 1000 (Utah 1982) ). A statute-of-limitations or statute-of-repose defense vests when the statutory period expires. "Since 1900, this court has consistently maintained that the defense of an expired statute of limitations is a vested right."
 
 Roark v. Crabtree
 
 ,
 
 893 P.2d 1058
 
 , 1062 (Utah 1995). Thus, "once a party acquire[s] a defense based upon an expired statute of limitations, that defense [can] not be impaired or affected by subsequent legislation extending the limitation period."
 

 Id.
 
 See also
 

 Stein v. Regions Morgan Keegan Select High Income Fund, Inc.
 
 ,
 
 821 F.3d 780
 
 , 794 (6th Cir. 2016) (stating that "statutes of repose vest a substantive right in defendants to be free of liability" (citing
 
 CTS Corp. v. Waldburger
 
 ,
 
 573 U.S. 1
 
 ,
 
 134 S.Ct. 2175
 
 , 2183,
 
 189 L.Ed.2d 62
 
 (2014) )). The federal government acquired its statute-of-repose defense, if at all, well before 2015. Accordingly, the 2015 amendments cannot be read to impair or affect that defense.
 
 [87]
 

 ¶ 73 Granting the 2015 amendments retroactive application in this context would also allow the Legislature to choose winners and losers in particular pending cases. Of course, the Legislature may by statutory amendment overrule our interpretation of statutes.
 
 See
 

 Foil
 
 ,
 
 601 P.2d at 150
 
 (finding it "indisputable that the Legislature intended to overrule" an earlier decision of this court). However, in
 
 Foil
 
 we recognized "the potential mischief, indeed, the grave constitutional problems, that could arise if the Legislature were to attempt to determine the outcome of a particular
 case by passage of a law intended to accomplish such a purpose."
 

 Id.
 

 at 151
 
 .
 
 See also
 

 Carter v. Lehi City
 
 ,
 
 2012 UT 2
 
 , ¶¶ 36-43,
 
 269 P.3d 141
 
 (discussing the constitutional prohibition against special legislation). The legislative role does not include picking "winners and losers in particular pending cases."
 
 See
 

 Bank Markazi v. Peterson
 
 , --- U.S. ----,
 
 136 S.Ct. 1310
 
 , 1338,
 
 194 L.Ed.2d 463
 
 (2016) (Roberts, C.J., dissenting).
 
 [88]
 

 ¶ 74 For these reasons, the 2015 amendments do not alter my conclusion that section 201 and its predecessor are statutes of repose.
 

 II. The Federal Government Is a Person For Purposes of Section 201
 

 ¶ 75 The State argues that the federal government may not invoke section 201, because the federal government does not qualify as a "person" under that section. The majority concludes that this question can be fairly said to be included within the scope of the certified question.
 
 Supra
 
 ¶12 n.25. "It has been the consistent practice of this court to decline to address issues that are not presented or fairly included in the question or questions that we have accepted for review."
 
 Miller v. United States
 
 ,
 
 2004 UT 96
 
 , ¶ 27,
 
 104 P.3d 1202
 
 (Durrant, J., concurring in part and dissenting in part).
 

 ¶ 76 It is not obvious to me that the question of whether section 201 is a statute of repose or a statute of limitations fairly includes the question of whether the federal government qualifies as a "person" for purposes of section 201. But assuming that the question of the personhood of the federal government is before us, it can in my judgment be readily resolved by reading the statutory text. "Courts are bound by the plain language of the statute."
 
 Aris Vision Inst., Inc. v. Wasatch Prop. Mgmt., Inc.
 
 ,
 
 2006 UT 45
 
 , ¶ 17,
 
 143 P.3d 278
 
 ,
 
 reh'g denied
 
 . "Accordingly, it is only 'when statutory language is ambiguous-in that its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis'-that we 'resort to other modes of statutory construction,' such as legislative history."
 
 Penunuri v. Sundance Partners, Ltd.
 
 ,
 
 2013 UT 22
 
 , ¶ 16,
 
 301 P.3d 984
 
 (citation omitted). In sum, "our analysis begins with the text of the statute and, if that text is unambiguous, ends there."
 
 State v. Rasabout
 
 ,
 
 2013 UT App 71
 
 , ¶ 28,
 
 299 P.3d 625
 
 ,
 
 aff'd
 
 ,
 
 2015 UT 72
 
 ,
 
 356 P.3d 1258
 
 .
 

 ¶ 77 The relevant statute here is Utah Code section 68-3-12.5. I agree with the majority that, given that the events in this case took place before 2010, the pre-2010 versions of the definitions statute appear to control, and that they all define "person" to include "bodies politic."
 
 See
 
 Revised Statutes of 1898 § 2498(5); UTAH CODE § 68-3-12(2)(o).
 
 Supra
 
 ¶12 n.25.
 
 [89]
 

 ¶ 78 Ample authority demonstrates that the federal government falls within the generally accepted definition of
 
 body politic
 
 at all relevant times.
 
 See, e.g.
 
 ,
 
 Monell v. Dep't of Social Servs.
 
 ,
 
 436 U.S. 658
 
 , 688 n.51,
 
 98 S.Ct. 2018
 
 ,
 
 56 L.Ed.2d 611
 
 (1978) ("The United States is a government, and, consequently, a body politic and corporate." (quoting
 
 United States v. Maurice
 
 , 26 Fed. Cas. 1211, 1216 (C.C.D. Va. 1823) ));
 
 Van Brocklin v. Tennessee
 
 ,
 
 117 U.S. 151
 
 , 154,
 
 6 S.Ct. 670
 
 ,
 
 29 L.Ed. 845
 
 (1886) (same);
 
 Cotton v. United States
 
 ,
 
 52 U.S. 11
 
 How. 229, 231,
 
 13 L.Ed. 675
 
 (1850) ("Although as a sovereign the United States may not be sued, yet as a corporation or
 body politic they may bring suits to enforce their contracts and protect their property, in the State courts, or in their own tribunals administering the same laws.");
 
 Body Politic
 
 , BLACK'S LAW DICTIONARY 143 (1st ed. 1891) ("[B]ody politic": "It is often used, in a rather loose way, to designate the state or nation or sovereign power, or the government of a county or municipality, without distinctly connoting any express and individual corporate charter").
 

 ¶ 79 Because the federal government is a body politic, it falls comfortably within the statute's definition of
 
 person
 
 .
 
 [90]
 

 * * *
 

 ¶ 80 We have been asked to read a statute. We should, in my judgment, stop "straining to avoid its natural meaning,"
 
 see
 

 Kungys v. United States
 
 ,
 
 485 U.S. 759
 
 , 781,
 
 108 S.Ct. 1537
 
 ,
 
 99 L.Ed.2d 839
 
 (1988). All members of this court agree that the text of section 201 unambiguously describes a statute of repose. No member of this court disputes that the result mandated by that statute of repose was the prevailing rule of law throughout the United States for over a century. I am thus at a loss to understand how we can label that result overwhelmingly absurd, especially when the State now has alternative remedies available to it under federal law.
 

 ¶ 81 I thus respectfully dissent.
 

 Like the majority opinion, unless otherwise indicated, I refer to the pre-2015, post-2008 version of the statute as section 201 and to the pre-2008 version of the statute as the predecessor to section 201.
 
 Supra
 
 ¶ 7 n.13. In addition, I refer to the 1872 version of the statute as the original predecessor to section 201.
 

 Like the majority opinion, I "answer this question within the context of the particular circumstances in which the question arose-the State's claims to rights of way under R.S. 2477."
 
 See
 

 supra
 
 ¶13.
 

 Because the majority opinion concludes that application of the statute according to its plain language would work an absurd result in the case before us, it has no need to consider hypothetical applications of the statute.
 
 See
 

 supra
 
 ¶21 n.50.
 

 I likewise do not consider hypothetical applications of section 201, but for a different reason. I follow the approach this court took in
 
 State ex rel. Z.C.
 
 ,
 
 2007 UT 54
 
 ,
 
 165 P.3d 1206
 
 . There, we analyzed the absurd result question "in the context of the law actually applied and the act with which the State chose to charge Z.C., not the law that might have been applied or the act with which the State could have charged Z.C."
 

 Id.
 

 ¶17 n.6. And we concluded that "applying the plain language of the statute
 
 in this case
 
 produces an absurd result."
 
 Id.
 
 ¶17 (emphasis added). For reasons explained in this opinion, and others both historical and legal, an R.S. 2477 quiet title claim against the federal government is
 
 sui generis
 
 . I therefore express no opinion as to whether any application of the plain language of section 201 other than the case before us would work an absurd result.
 

 Not until 1972 would the Quiet Title Act waive immunity with respect to claims for rights of access and rights of way. 28 U.S.C. § 2409a (2011). The Quiet Title Act permits the United States to be named as a party defendant in a civil action under the Act "to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights."
 
 Id.
 
 § 2409a(a). And in 1976 "Congress abandoned its prior approach to public lands and instituted a preference for retention of the lands in federal ownership, with an increased emphasis on conservation and preservation."
 
 Southern Utah Wilderness All.
 
 ,
 
 425 F.3d at 741
 
 . "As part of that statutory sea change, Congress repealed R.S. 2477."
 

 Id.
 

 "There could be no new R.S. 2477 rights of way after 1976."
 

 Id.
 

 Like the fact that federal sovereign immunity barred Utah's title claims against the United States from the Mexican Cession until the passage of the Quiet Title Act, the availability of a federal administrative remedy distinguishes these claims against the federal government from all other claims to which section 201 might hypothetically apply.
 

 Because the majority opinion reforms section 201 as a statute of limitations, it does not need to consider the State's alternative argument for reading that section as a statute of limitations. But because I read section 201 as a statute of repose, I must explain why the State's alternative argument fails.
 

 In contrast to House Bill 1001, House Bill 401 passed both houses of the Legislature without floor debate.
 
 See
 
 Utah House Floor Debates, H.B. 401, 61st Leg., 2015 Gen. Sess. (Mar. 5, 2015), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=18757&meta_id=548111 [https://perma.cc/5K7E-VX4H]; Utah Senate Floor Debates, H.B. 401, 61st Leg., 2015 Gen. Sess. (Mar. 12, 2015), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=18898&meta_id=552758 [https://perma.cc/H6Z2-98F5].
 

 Utah House Floor Debates, H.B. 1001, 61st Leg., 2015 1st Spec. Sess. (Aug. 19, 2015) (statements of Rep. Michael E. Noel), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=19095&meta_id=560947 [https://perma.cc/SFY8-M6GR].
 

 Utah Senate Floor Debates, H.B. 1001, 61st Leg., 2015 1st Spec. Sess. (Aug. 19, 2015) (statements of Sen. Jim Dabakis), http://utahlegislature.granicus.com/MediaPlayer.php?clip_id=19094&meta_id=560932 [https://perma.cc/P6WC-HPTP]
 

 Any claim that the amendments merely clarified the intent of the Territorial Legislature of 1872 lacks support in both fact and law.
 
 See, e.g.
 
 ,
 
 State v. Perez
 
 ,
 
 2015 UT 13
 
 , ¶ 9,
 
 345 P.3d 1150
 
 (stating that our recent cases expressly repudiate an exception to the rule against retroactivity for clarifying amendments).
 

 Indeed, if the State's argument prevailed, the Legislature could control every stage of the pending litigation against the federal government by periodically amending any relevant state statute or rule and declaring the amendment to have retroactive effect.
 

 Though probably inapplicable here, the 2010 version of the statute defines
 
 person
 
 to include both a "body of government" and "any other organization or entity." Utah Code § 68-3-12.5(14). The federal government is unquestionably a "body of government."
 
 See, e.g.
 
 ,
 
 Cogger v. County of Becker
 
 ,
 
 690 N.W.2d 739
 
 , 742 (Minn. 2005) (referring to "the federal government as the sole body of government authorized to interact with" Native Americans). The federal government is also an entity. Indeed, in discussing public lands within improvement districts, another Utah statute cites the federal government as its first example of an entity: "Fee lands and property of
 
 public entities such as the federal government
 
 ...." Utah Code § 54-8-5(8) (emphasis added). Accordingly, under the 2010 version of section 12.5, the United States indisputably qualifies as a person.
 

 In my judgment, the term
 
 body politic
 
 unambiguously encompasses the federal government. But even if the definitional section could plausibly be read-as the State urges-to grant the State greater rights under section 201 against the federal government than against other defendants, such a reading would risk running afoul of the Supremacy Clause. The Supremacy Clause forbids states to discriminate against the United States.
 
 See
 

 Phillips Chem. Co. v. Dumas Indep. Sch. Dist.,
 

 361 U.S. 376
 
 , 387,
 
 80 S.Ct. 474
 
 ,
 
 4 L.Ed.2d 384
 
 (1960). The canon of constitutional avoidance holds that we may "reject[ ] one of two plausible constructions of a statute on the ground that it would raise grave doubts as to its constitutionality."
 
 Utah Dep't of Transp. v. Carlson
 
 ,
 
 2014 UT 24
 
 , ¶ 23,
 
 332 P.3d 900
 
 . Accordingly, even if the State's reading were plausible, I would reject it under this canon.