**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 26, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

LEXINGTON INSURANCE
COMPANY,

      Plaintiff - Appellee,

v.

PRECISION DRILLING COMPANY,
L.P., f/k/a Grey Wolf Drilling
Company, LP; LLOYD'S OF
LONDON SYNDICATE #4711, a/k/a
Aspen Syndicate #4711; LLOYD'S OF
LONDON SYNDICATE #33;
LLOYD'S OF LONDON
SYNDICATE #1209; ACE GLOBAL
MARKETS,

      Defendants - Appellants,

and

UPSTREAM INTERNATIONAL,
LLC,

      Defendant.

No. 15-8036

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:12-CV-00070-ABJ)**

---

Robert J. Walker (John M. Walker, with him on the briefs), Hickey & Evans,
LLP, Cheyenne, WY, for Defendants-Appellants.

Cathleen Heintz (Elayna M. Fiene, with her on the brief), Wilson Elser Moskowitz Edelman & Dicker, LLP, Denver, CO, for Plaintiff-Appellee.

Before **GORSUCH**, **BACHARACH**, and **McHUGH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

Years ago, Darrell Jent suffered serious injuries while working on an oil rig. Eventually the rig's owner, Precision Drilling, paid him a settlement and that might have seemed the end of it. But there lingers still today the question who is on the hook for the bill. Precision contends that Lexington, an insurance company, should reimburse the money it paid Mr. Jent. For purposes of this appeal, Lexington accepts that it issued (and was paid for) two insurance policies covering Precision for accidents exactly like this one. But, it argues, a Wyoming state statute renders those policies a nullity so any coverage here was more illusory than real and any liability must be Precision's alone. At summary judgment, the district court agreed with Lexington, held the insurer free from liability, and granted it costs and fees. We reverse.

There can be no doubt that Wyoming law usually prohibits those engaged in the oil and gas industry from contractually shifting to others liability for their own negligence. Just as Lexington points out, the state's Anti-Indemnity Statute declares void as a matter of public policy "[a]ll agreements . . . pertaining to any

well for oil, gas or water . . . to the extent [they] . . . purport[] to relieve the indemnitee from loss or liability for his own negligence." Wyo. Stat. Ann. § 30-1-131(a)(iii)(B). So it seems Wyoming generally wishes those engaged in oil and gas extraction to internalize the costs of their own operations, maybe on the view that doing so will encourage them to be more mindful of employee safety, *see Union Pac. Res. Co. v. Dolenc*, 86 P.3d 1287, 1292-95 (Wyo. 2004), or maybe on the view that doing so will limit the expansion of liability and so encourage the industry's growth.

The trouble for Lexington is the statute doesn't stop there. In fact, the very next sentence adds that "[t]his provision shall not affect the validity of *any insurance contract*." Wyo. Stat. Ann. § 30-1-131(a)(iii)(B) (emphasis added). So while indemnity agreements are generally impermissible, insurance contracts supply an exception to the rule. And everyone before us takes as a given for purposes of this appeal that Lexington issued and Precision seeks to invoke two insurance contracts that provide coverage for the accident here. Knowing that much would seem to be the end of this appeal, for "[w]hen a statute is as clear as a glass slipper and fits without strain," it is our job merely to put it on the foot where it belongs. *Demko v. United States*, 216 F.3d 1049, 1053 (Fed. Cir. 2000).

But that, of course, is not quite the end of this appeal. Lexington suggests the Wyoming legislature intended to allow an oil or gas company to benefit from insurance coverage only if it (and not a third party) purchased the policy in

question. Any other result, it argues, would permit companies like Precision to accomplish by insurance contract what they can't by indemnity agreement. After all, the policies Precision now seeks to invoke were paid for by one third party (the well-site manager) at the request of still another (the leaseholder). And while a company that pays for its own insurance coverage has reason to avoid the costs associated with triggering it, Lexington submits, one who can invoke a policy paid for by another can of course expect someone else to foot the bill. And in Lexington's telling that arrangement looks a lot like an indemnity agreement and invites the same moral hazard by reducing the employer's incentive to care for employee safety. So it is Lexington urges us to construe the Wyoming statute to bar Precision from claiming coverage under a policy someone else had to buy. A reading it believes necessary to advance the legislative intentions underlying the statute and avoid absurd consequences.

We cannot agree. By way of support for its belief that the Wyoming legislature "intended" to allow only those who purchase a policy to benefit from its terms, Lexington points to the fact that some other states have enacted laws expressly providing as much. *See, e.g.*, N.M. Stat. Ann. § 56-7-1; Colo. Rev. Stat. § 13-21-111.5(6); Okla. Stat. tit. 15, § 221; Kan. Stat. Ann. § 16-121. But the best evidence of legislative intentions lies in the language the legislature actually adopted and the executive actually signed. *Holland v. Dist. Court*, 831 F.2d 940, 943 (10th Cir. 1987); *Halliburton Co. v. McAdams, Roux & Assocs.*,

773 P.2d 153, 155 (Wyo. 1989). And for whatever reason, the Wyoming legislature didn't employ the same language found in these statutes. Instead, it expressly allowed the enforcement of *any* insurance contract — and its choice to do something different than other states have done is a choice we as judges must honor, not undo. *Hede v. Gilstrap*, 107 P.3d 158, 163 (Wyo. 2005) ("It is not the court's prerogative to usurp the power of the legislature by deciding what should have been said. . . . And of specific importance to the instant case is the precept that exceptions not made by the legislature in a statute cannot be read into it."). Neither is this a case where Lexington offers some persuasive reason to think that the Wyoming legislature's use of the term "any" in this particular context carries with it some textual ambiguity — as it might where (say) an American statute speaks of "any court" but a reasonable reader would wonder whether it means to address foreign courts given the usual presumption that, absent a clear statement, Congress intends to legislate only domestically. *See, e.g.*, *Small v. United States*, 544 U.S. 385, 388-89 (2005).

Instead of supplying a case for textual ambiguity, Lexington asks us to override the statute's admittedly plain text simply on the basis of speculation about the Wyoming legislature's textually unexpressed intentions. But that's a guessing game both sides can almost always play — and certainly can here. Maybe someone somewhere in the legislative process inserted Wyoming's more generous language about insurance contracts with the hope of promoting sales to

the insurance industry.  Maybe the author of the Anti-Indemnity Statute didn't care to limit that particular industry's liabilities.  Maybe someone along the way concluded that insurance companies are better suited than oil and gas companies to assess and price risk.  Or maybe someone thought that oil and gas firms with insurance, even if purchased by a third party, will still internalize the risk of accident sufficiently to exercise appropriate care.  Maybe, too, no one in the Wyoming legislature thought about any of this, and Lexington might prevail on them to do so now.  The fact is the task of trying to discern the textually unexpressed intentions of (or really attribute such intentions to) a legislative body composed of scores or often hundreds of individuals is a notoriously doubtful business — and precisely never enough to trump the unambiguous text a majority of legislators actually adopted.  *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it according to its terms." (internal quotation marks omitted)); *Gemsco, Inc. v. Walling*, 324 U.S. 244, 260 (1945) ("The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction."); *State ex rel. Wyo. Dep't of Revenue v. Buggy Bath Unlimited, Inc.*, 18 P.3d 1182, 1187 (Wyo. 2001) ("When the words used are clear and unambiguous, a court risks an impermissible substitution of its own views, or those of others, for the intent of

the legislature if any effort is made to interpret or construe statutes on any basis other than the language invoked by the legislature."). *See also generally* John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2390-91 (2003); Kenneth A. Shepsle, *Congress Is a "They," Not an "It": Legislative Intent as Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992).

Lexington's invocation of the absurdity doctrine is no more persuasive than (or really more than a repackaging of) its speculation about legislative intentions. To be sure, at one time some thought a court could override even unambiguous statutory texts like the one before us in order to avoid putatively absurd consequences in their application. *See, e.g.*, *Church of the Holy Trinity v. United States*, 143 U.S. 457, 459-62 (1892); Manning, *supra*, at 2389 & n.5. But this court some years ago all but rejected at least this particular form of the absurdity doctrine. *See, e.g.*, *Robbins v. Chronister*, 435 F.3d 1238, 1241-43 (10th Cir. 2006) (en banc); *accord Jaskolski v. Daniels*, 427 F.3d 456, 462-64 (7th Cir. 2005). And it seems highly unlikely that the Wyoming Supreme Court would prove any more receptive to it today, for it has recently and expressly held that "where a statute is . . . plain and unambiguous . . . courts construing the [statute] should not be concerned with the consequences resulting therefrom." *Mountain Cement Co. v. S. of Laramie Water & Sewer Dist.*, 255 P.3d 881, 897 (Wyo. 2011) (emphasis omitted).

This makes sense, too. To label a statute's consequences "absurd," a court usually must again engage in the doubtful business of guessing at hidden legislative intentions, offering this time the particular guess that the legislature couldn't possibly have "intended" a particular consequence to flow from its handiwork. *See* Manning, *supra*, at 2390. And guesses about legislative intentions are, as we've seen, never a proper basis for overruling plain statutory language. Any attempt to use absurdity doctrine to overrule plain statutory text would invite all the well-documented problems associated with trying to reconstruct credibly the intentions of hundreds of individual legislators. Deploying the doctrine in this fashion would also, like all judicial efforts to assert the primacy of hidden intentions over plain text, risk offending the separation of powers by purporting to endow a court with the power to disregard a possible statutory application not because of its linguistic implausibility but because of a judgment about the implausibility of its consequences as a matter of social policy — a judgment that seems a good deal more legislative than judicial in character. *See, e.g.*, *Robbins*, 435 F.3d at 1243; *In re Estate of Seader*, 76 P.3d 1236, 1244 (Wyo. 2003). Any attempt to use absurdity doctrine in this way would, as well, risk granting to courts the power to negate a statute's application as irrational without first making the determination — normally and properly required for lawful judicial intervention — that the statute's application fails to clear the exceedingly low threshold of due process or equal protection rational basis

review.  By "[a]dmit[ting] the propriety of 'fixing [statutory] mistakes,'" too, using absurdity doctrine to overrule plain statutory text would invite (tempt?) courts to identify "mistakes" in the first place.  *Jaskolski*, 427 F.3d at 462.  That's a vision of the judicial function that risks both relieving legislatures of accountability for the laws they write and reducing their incentive to tailor those laws carefully.  And a vision that threatens due process (fair notice) problems by foisting retroactively on litigants textual interpretations they would have had difficulty imagining when arranging their affairs.  All that is much too much of a price to pay for any "interpretive aid," especially when so many other canons of construction — ones more finely honed and consistent with the judicial function (like the presumption against statutes with extraterritorial application discussed in *Small*) — now exist to serve many of the same goals absurdity doctrine once sought to serve.  *Robbins*, 435 F.3d at 1242-43.

This is not to say absurdity doctrine has no role left to play when it comes to seemingly clearly worded statutes.  Take the scrivener's error.  Sometimes a statute will misspell "third party" as "third partly."  Antonin Scalia & Bryan A. Garner, Reading Law 235 (2012).  Or provide that the "winning party" rather than the "losing party" must pay the other side's reasonable attorney's fees.  *Id.*  In cases like these, the error in the statute is so "unthinkable" that any reasonable reader would know immediately both (1) that it contains a "technical or ministerial" mistake, and (2) the correct meaning of the text.  *Id.* at 237-38.

When these demanding conditions are met, a court may invoke the doctrine to enforce the statute's plain meaning, much as it might in cases where a modifier is misplaced or the grammar otherwise mangled but the meaning plain to any reasonable reader. *See, e.g.*, *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 462 (1993); *Payless Shoesource, Inc. v. Travelers Cos.*, 585 F.3d 1366, 1371 (10th Cir. 2009). Cabined in this way, the absurdity doctrine seeks to serve a "linguistic rather than substantive" function, *Jaskolski*, 427 F.3d at 462, and does not depend nearly as much on doubtful claims about legislative intentions, risk nearly as much interference with the separation of powers, or pose anything like the same sort of fair notice problems as its more virulent cousin. Instead, it aims only to enforce a meaning reasonable parties would have thought plain all along. Of course, Lexington cannot come close to making the showing needed to trigger this more refined strain of absurdity doctrine in this case. The insurer identifies no technical or ministerial error we might fairly attribute to the scrivener or draftsman. Neither is it possible to say that the insurer's reading of the statute would have been obvious to any reasonable reader of the law at the time the well-site leaseholder, manager, and Precision struck their deals. Very much to the contrary and again, it is hardly unthinkable that they might have

understood the statute as meaning exactly what it says and ordered their affairs accordingly.[1]

Left without anything in the neighborhood of a viable statutory interpretation argument, Lexington closes with an appeal to precedent. The company claims that, whatever we think the statute says, we are bound to rule in its favor by *True Oil Co. v. Mid-Continent Casualty Co.*, 173 F. App'x 645 (10th Cir. 2006). But that unpublished decision supplies only persuasive, not binding, authority, and for reasons we've already explored it could not say anything that might persuade us to abandon the plain language of the statute. Even beyond that, the case is easily distinguishable on its own terms. In *True Oil*, the party seeking coverage could qualify as an additional insured under the terms of the relevant policy only by showing that it had an "insured contract" with the policyholder. *Id.* at 649. And the only agreement it could point to that might have met that condition precedent was an indemnity agreement rendered unenforceable by the

---

[1] My colleagues observe that Lexington didn't use the phrase "absurd consequences" until oral argument and so suggest we might exercise our discretion to deem any argument in that direction waived. *See Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 837 (10th Cir. 2014) (waiver is a discretionary doctrine). But, respectfully, I read Lexington's brief as it does: as presenting an absurd consequences argument in substance. By everyone's estimation, after all, Lexington argues that the legislature couldn't possibly have intended the result the statute's plain language suggests due to the supposedly terrible public policy consequences that would follow. And what (again) is an absurd consequences argument but an argument that the legislature could not possibly have "intended" a particular result? Lexington's argument is, as well, so easily dispensed with on the merits that I see no reason to avoid it with a contestable claim of waiver.

first sentence in Wyoming's statute. *Id.* at 649-50. No similar problem exists here: though the insurance policies in this case were paid for by a third party, Lexington doesn't suggest that Precision's status as an additional insured under their terms depends on the existence of an unlawful indemnity agreement. To be sure, Lexington might complain that the parties in *True Oil* could have achieved insurance coverage if only they had structured their deal a little differently, more along the lines the parties pursued here, and perhaps that's true. But the point of law is to put people on notice of how to go about structuring their relations; the parties here took care to conform their actions to the law's directions; and they are not to be rewarded for having done so with a judicial decree that retroactively punishes them for their trouble.

We readily acknowledge that our decision today does not fully resolve the parties' dispute. By way of example only, the district court didn't decide whether Precision qualifies as an additional insured under the Lexington policies but assumed without deciding it did, an assumption the parties and we have also indulged in this appeal. Now, of course, the parties will be free to litigate that question when the case returns to the district court. The judgment of the district court is reversed, the award of costs and fees to Lexington is vacated, and the case is remanded for further proceedings consistent with this opinion.

*Lexington Insurance Company v. Precision Drilling Company, L.P.*, No. 15-8036
**BACHARACH**, J., concurring, joined by McHugh, J.

I agree with the majority that we should affirm and I join virtually all of Judge Gorsuch's well-reasoned lead opinion. I write separately only with respect to the lead opinion's analysis of the absurdity doctrine. *See* Maj. Op. at 6-10. Though I agree that we should reject Lexington's argument based on the absurdity doctrine, I would approach the issue differently. In my view, Lexington waived this argument. And even if this argument had been preserved, I would reject it without defining the outer contours of the absurdity doctrine in Wyoming.

Lexington concedes that its appeal briefs did not include an argument involving the absurdity doctrine. Oral Arg. at 23:44-24:06. Instead of briefing the issue, Lexington waited until oral argument to make an argument based on the absurdity doctrine; even then, Lexington did so only in response to a question from the panel. By waiting until oral argument, Lexington waived its appeal point based on the absurdity doctrine. *Fed. Ins. Co. v. Tri-State Ins. Co.*, 157 F.3d 800, 805 (10th Cir. 1998).

In its appeal briefs, Lexington had couched the argument differently, arguing that recognition of an exception under § 30-1-131 for insurance contracts would violate this statute's public policy against indemnifying a party for its own negligence. This is not an absurdity-doctrine argument, but an argument about how to reconcile two components of the same statutory provision. The Wyoming Supreme Court has squarely rejected Lexington's argument, holding that the

statute should be construed according to its plain language even where doing so would frustrate public policy concerns expressed elsewhere in the statute. *Union Pac. Res. Co. v. Dolenc*, 86 P.3d 1287, 1295 (Wyo. 2004).

The lead opinion generously treats Lexington's statutory-interpretation argument as an argument based on the absurdity doctrine. I would decline to do so because the arguments are distinct. But even if we recharacterize Lexington's argument, as the lead opinion does, I would reject the absurdity argument without defining the doctrine's outer reach. Regardless of whether we treat Wyoming's absurdity doctrine as narrow or broad, Lexington's argument would fail.

As explained in the lead opinion, the Wyoming legislature could have had any number of reasons for exempting insurance contracts from the prohibition against indemnifying wrongdoers. Maj. Op. at 5-6. As a result, a straightforward reading of § 30-1-131 cannot be considered absurd even under the broadest conceivable interpretation of Wyoming's absurdity doctrine. Thus, even if we had to reach an argument on the absurdity doctrine, I would reject that argument without deciding the outer reaches of the doctrine. Whether narrow or broad, that doctrine would not support Lexington's effort to nullify the statute's unambiguous exception for insurance contracts. Accordingly, I respectfully concur in the judgment to reverse and remand.