**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 26, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

LEXINGTON INSURANCE COMPANY,

      Plaintiff - Appellant/Cross-
      Appellee,

v.

PRECISION DRILLING COMPANY,
L.P., f/k/a Grey Wolf Drilling Company,
LP; LLOYD'S OF LONDON
SYNDICATE #4711, a/k/a Aspen
Syndicate #4711; LLOYD'S OF LONDON
SYNDICATE #33; LLOYD'S OF
LONDON SYNDICATE #1209; ACE
GLOBAL MARKETS,

      Defendants - Appellees/Cross-
      Appellants.

Nos. 18-8072 & 18-8080

_____

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 2:12-CV-00070-ABJ)**
_____

Mark J. Sobczak (Matthew J. Fink with him on the briefs), Nicolaides Fink Thorpe
Michaelides Sullivan, LLP, Chicago, Illinois, for Plaintiff–Appellant/Cross–Appellee.

Robert J. Walker (John M. Walker with him on the briefs), Hickey & Evans, LLP,
Cheyenne, Wyoming, Defendant–Appellee/Cross–Appellant.
_____

Before **PHILLIPS**, **EBEL**, and **O'BRIEN**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.

_____

In an earlier appeal, we ruled that Wyoming's anti-indemnity statute would not defeat possible insurance coverage to an additional insured. In this second appeal and cross-appeal, we must decide whether the district court correctly ruled that additional-insured coverage exists under the applicable insurance policies; whether the district court entered judgment for the additional insured in an amount greater than the policy limits; and whether the district court correctly ruled that the additional insured was not entitled to prejudgment interest and attorneys' fees. We conclude that the district court ruled correctly on each issue, so we affirm.

## BACKGROUND

### I. Factual Background

At all relevant times, Ultra Resources, Inc. ("Ultra"), held a lease for a Wyoming well site. In January 2007, Ultra contracted with Upstream International, LLC ("Upstream"), under a Master Service Agreement to manage the well site. The Ultra-Upstream contract required Upstream to obtain insurance policies with a stated minimum amount of coverage for Ultra and Ultra's contractors and subcontractors. To do so, Upstream obtained two policies from Lexington Insurance Company ("Lexington")—a General Liability Policy ("General Policy") and a Commercial Umbrella Policy ("Umbrella Policy"). Lexington issued and delivered the two policies in Texas.

In October 2007, Upstream employed Darrell Jent as an independent contractor/consultant (calling him its "company man") to help it manage some of Ultra's well sites. Appellant's App. vol. 1 at 218, 240.

In March 2008, Ultra contracted with Precision Drilling ("Precision") to operate a drilling rig at the well site. Precision maintained a separate insurance policy with Lloyd's of London ("Lloyd's"), covering Precision for primary and excess liability. Then in August or September, in coordination with Ultra, Upstream re-assigned Jent from his work duties as rig manager on a different rig at an Ultra well site to supervise Precision's rig, hoping to improve the rig's performance and get it on budget. Appellees' Principal Br. 4 ("Jent was assigned by Upstream to Rig #841 [Precision] to fulfill the contractual obligations set forth within the Ultra-Upstream Contract."). Several times, Jent (after consulting with Ultra) temporarily shut down the rig for deficiencies in Precision's performance. Jent enforced safety protocols on the rig, sometimes reprimanding Precision employees for violations. Further, Jent advised Ultra to drug test some Precision rig hands after correctly suspecting they were using methamphetamine.

Sometime before December 27, 2008, Precision scheduled a rig-down operation so that it could move its rig to another site.[1] That day, Jent held two safety meetings with Precision employees about the rig-down operation. As one part of the operation, Precision needed to lower the rig derrick. As that happened, Jent stood on

---

[1] We cannot describe this activity in better detail, because we lack the necessary information to do so from the briefs and record.

3

the rig's platform, overseeing the removal of the rig's leg pins. The leg pins helped secure the rig deck. Jent was concerned with the pins' removal "because a lot of times those guys, they'll hit those pins and they'll come flying out . . . [and can] hit [someone] in the forehead [if they are] standing in the wrong place." Appellant's App. vol. 2 at 320. Precision's employees safely removed the pins.

Jent assumed that Precision employees had already attached and tightened all A-leg bolts. In fact, Precision employees had loosened the A-leg bolts—which attach the A-legs to the derrick—and had not properly secured these bolts. After supervising the pin removal, Jent had just left the rig floor and reached "the top step leading down from the rig floor" when the derrick fell because of the "defectively bolted 'A-legs' attaching the derrick to the rig floor." Appellant's App. vol. 1 at 150, vol. 2 at 391. Jent was seriously injured after being thrown from the steps.

## II.     Procedural Background

Jent sued Precision for negligence. Precision was the lone defendant. Jent based his negligence claim on Precision's employees having "previously loosened" the A-leg bolts and having failed to "properly re-attach and tighten" the bolts. Appellant's App. vol. 1 at 150. Jent further alleged that Precision's employees had failed to pin the steps down to the rig. Jent alleged that these failures led to "[o]ne of the A-legs [coming] loose from the rig floor, causing the derrick to crash down. . . . When the derrick crashed, the steps fell and catapulted [Jent] off the steps." *Id.* ¶ 24.

4

After being served with the complaint, Precision demanded that Ultra defend and indemnify it as required by the Ultra-Precision drilling contract. Ultra, in turn, demanded that Upstream defend Precision under the insurance policies required by the Ultra-Upstream Contract. In February 2011, Upstream tendered the claim to its insurer, Lexington, which agreed to defend Precision subject to a full reservation of its rights. In February 2012, Lexington exercised its reserved rights and denied any duty to defend or indemnify Precision against Jent's claims. Lexington told Precision and its insurer, Lloyd's, that it denied coverage and left it to Precision and Lloyd's to defend against Jent's suit. In April 2012, Precision and Lloyd's attended a mediation conference and settled Jent's claims for $3 million (Lexington chose not to attend and denied liability for any part of the settlement).

After the settlement, Lexington filed a declaratory-judgment action against Precision, Lloyd's, and Upstream, seeking a court ruling that it owed no duty to defend or indemnify Precision against Jent's claims. In support, Lexington argued that "Wyoming['s] Anti-Indemnity Statute applies to Precision's claim for defense and indemnity," which would void any insurance coverage to Precision under the Lexington-Upstream policies. *See* Wyo. Stat. Ann. § 30-1-131 (2012); Appellant's App. vol. 2 at 339.

Precision, Lloyd's, and Upstream each answered Lexington's declaratory-judgment complaint. In their answers, Precision and Lloyd's requested a declaration

that Lexington was indeed liable to reimburse them for defense costs and the full Jent settlement.[2]

All parties[3] moved for summary judgment, stipulating that they disputed no material facts and waiving trial. Appellees' Principal Br. 15 ("Thereafter, the parties conceded that the case should be resolved by dispositive motion and waived trial."); Appellant's App. vol. 2 at 466 ("There are no factual issues to be resolved at trial, and . . . Lexington's request for a determination on the applicability of the Wyoming Anti-Indemnity Statute to this dispute may be resolved by the Court as a matter of law.").

In its motion for summary judgment, Precision asserted that Lexington owed it coverage under Lexington's two policies. As support, Precision argued that it was an "additional insured" under the two policies, which entitled it to $3 million in coverage needed to settle Jent's claims.[4] Precision also sought its attorneys' fees, statutory prejudgment interest, and costs. *See* Wyo. Stat. Ann. § 26-15-124(c). As a second matter, Precision also contested that Wyoming's anti-indemnity statute would apply to defeat that coverage.

---

[2] Though both Precision and Lloyd's answered Lexington's Second Amended Complaint, neither filed a counterclaim. In their answers, both parties requested a declaration that they could recover from Lexington.

[3] On appeal, Precision refers to itself, Lloyd's, and ACE Global Markets collectively as "Precision."

[4] Yet we note that Precision's coverage argument was incomplete. To have coverage, Precision needed to satisfy Endorsement 17 to the General Policy, a policy provision whose terms Precision failed to mention.

In its motion for summary judgment, Lexington bypassed the coverage issue and exclusively argued that Wyoming's anti-indemnity statute would void any possible coverage under the Lexington policies. *See* Wyo. Stat. Ann. § 30-1-131.

The district court granted Lexington's motion for summary judgment, agreeing that Wyoming's anti-indemnity statute would void any possible insurance coverage due Precision under Lexington's two insurance policies. *Lexington Ins. Co. v. Precision Drilling Co.*, No. 12-CV-070-J, 2014 WL 11515822, at *9 (D. Wyo. Dec. 19, 2014).[5]

On appeal, Lexington defended the district court's interpretation of Wyoming's anti-indemnity statute. *Lexington Ins. Co. v. Precision Drilling Co.* (*Precision I*), 830 F.3d 1219, 1220 (10th Cir. 2016). As part of its doing so, Lexington pointed to statutes from states other than Wyoming "allow[ing] only those who purchase a policy to benefit from its terms." *Id.* at 1221. But we reversed, reasoning that in enacting Wyoming's anti-indemnity rule[6] the "Wyoming Legislature didn't

---

[5] Upstream had also moved for summary judgment on grounds that it was not a necessary party because "[n]o relief has been sought against Upstream; no facts are alleged against Upstream; no causes of action are asserted against Upstream[.]" The district court agreed, declaring that it was "unable to divine any actual, rather than hypothetical or speculative, claim that Lexington may have against Upstream." *Lexington*, 2014 WL 11515822, at *9. This ended Upstream's involvement.

[6] Wyoming's anti-indemnity statute reads:

(a) All agreements, covenants or promises contained in, collateral to or affecting any agreement pertaining to any well for oil, gas or water, or mine for any mineral, which purport to indemnify the indemnitee against loss or liability for damages for:

employ the same language found in [those other states'] statutes. Instead, it expressly

allowed the enforcement of *any* insurance contract[,]" including ones "someone else

had to buy." *Id.* In remanding, we acknowledged that "our decision today does not

fully resolve the parties' dispute," noting "[b]y way of example only" that the parties

could next litigate "whether Precision qualifies as an additional insured under the

Lexington policies." *Id.* at 1224.

After returning to district court, Precision and Lexington filed post-remand

motions for summary judgment. Precision's motion raised two issues: (1) whether it

was entitled to coverage as an additional insured under the Lexington-Upstream

---

(i) Death or bodily injury to persons;
(ii) Injury to property; or
(iii) Any other loss, damage, or expense arising under either (i) or (ii) from:
> (A) The sole or concurrent negligence of the indemnitee or the agents or employees of the indemnitee or any independent contractor who is directly responsible to such indemnitee; or
> (B) From any accident which occurs in operations carried on at the direction or under the supervision of the indemnitee or an employee or representative of the indemnitee or in accordance with methods and means specified by the indemnitee or employees or representatives of the indemnitee, are against public policy and are void and unenforceable to the extent that such contract of indemnity by its terms purports to relieve the indemnitee from loss or liability for his own negligence. This provision shall not affect the validity of any insurance contract or any benefit conferred by the Worker's Compensation Law . . . of this state.

Wyo. Stat. Ann. § 30-1-131.

8

policies, and (2) if so, whether it was entitled to statutory prejudgment interest. And Precision argued that Lexington had forfeited an ability to contest either issue by its earlier failure to address either in response to Lexington's pre-remand motion for summary judgment.

In its own motion about a month later, Lexington denied having forfeited anything, pointing to the broad language in our *Precision I* mandate.[7] Addressing the merits, Lexington does not contest Precision's status as an "additional insured" under Lexington's policies.[8] But Lexington emphasized that Precision needed to show more to qualify for additional-insured coverage—namely, that it met the coverage

---

[7] Precision also requested that the district court strike as untimely Lexington's summary-judgment motion in its entirety. *See Lexington Ins. Co. v. Precision Drilling Co.*, No. 12-CV-70-ABJ, 2018 WL 8807146, at *2 (D. Wyo. Sept. 6, 2018). But the district court declined to do so, noting that Lexington's motion for summary judgment was in substance "very much a response to Precision's Motion except that it contained one new issue." *Id.* The court further noted that "Precision even seems to acknowledge the generally responsive nature of Lexington's Motion because Precision's Reply in large part treats Lexington's Motion as a response." *Id.* So the district court denied Precision's request to strike Lexington's motion and instead treated "it as a response." *Id.*

[8] Precision is an additional insured under the Lexington policies because it is a "contractor" under the Ultra-Upstream Master Service Agreement. The General Policy's Endorsement 17 amends the "Who is an Insured" section to include "any person or organization you [Upstream] are required to include as an additional insured on this policy by a written contract or written agreement in effect during this policy period." Appellant's App. vol. 1 at 94. The Umbrella Policy includes as an "insured" "[a]ny person or organization, other than the 'Named Insured', included as an additional 'Insured' under 'scheduled underlying insurance', but not for broader coverage than would be afforded by such 'scheduled underlying insurance[.]'" Appellant's App. vol. 1 at 119–20. The scheduled underlying insurance includes the General Policy.

9

conditions imposed by Endorsement 17 to the General Policy. We note that coverage under Endorsement 17 depends on whether Precision could show (1) liability of Precision (2) arising out of (3) work performed by Upstream (through Jent), (4) for Precision. Of these coverage conditions, Lexington disputes only that Precision has met the fourth condition.

The district court ruled that Lexington had not forfeited its ability to contest Precision's additional-insured argument. *See Lexington Ins. Co. v. Precision Drilling Co.*, No. 12-CV-70-ABJ, 2018 WL 8807146, at *3 (D. Wyo. Sept. 6, 2018). After disposing of this preliminary question, the district court went on to rule for Precision on the merits. Addressing Endorsement 17's disputed fourth condition, the district court concluded that Jent's work for Upstream supervising Precision's rig-down operation had been "for" Precision. *Id.* at *5–6. In support, the district court noted that Ultra had hired Upstream solely to manage the well site and that Jent was assigned to Precision's rig to "perform[] some level of safety oversight on the drilling rig and actively tr[y] to help Precision's employees operate the drilling rig better to make the well more productive." *Id.* at *6. Because of this, the district court concluded Jent "was performing work for Precision and Precision is an additional insured." *Id.*

As a fallback, Lexington argued a second point—that its policy limits were $2 million. Here, Lexington directed the court to Endorsement 3 of the Umbrella Policy. But the district court cut this argument short. It deemed Lexington's policy-limits argument forfeited, because Lexington had failed to "address any of the substance of

10

Precision's First Motion for Summary Judgment [pre-remand] in its response but instead re-argued its statutory argument." *Lexington Ins. Co.*, 2018 WL 8807146, at *4. It further noted that Lexington did not "mention the issue of maximum coverage in their filings related to the first [pre-remand] cross motions for summary judgment, nor did they mention it before the 10th Circuit." *Id.*

Finally, the district court denied Precision's request for costs, prejudgment interest, and attorneys' fees. *Id.* at *6; *see also* Wyo. Stat. Ann. § 26-15-124(c) (2018). The court concluded that to obtain the requested relief under this statute, Lexington needed to show something that it could not—that Lexington had issued and delivered the policies in Wyoming, not Texas. *Lexington Ins. Co.*, 2018 WL 8807146, at *6.

At the end of the day, the district court entered judgment for Precision against Lexington for the Jent settlement amount of $3 million. *Id.* The parties have cross-appealed.

## DISCUSSION

We first identify the standard of review. Next we address whether Lexington's policies provide Precision coverage as an additional insured. Then we address Lexington's policy-limits argument. Finally we address Precision's challenge to the district court's denial of prejudgment interest and attorneys' fees.

## I. Standard of Review

This case presents an unusual procedural posture. As mentioned, in the pre-remand round of summary-judgment motions, the parties informed the district court

11

that they disputed no material facts and waived trial. And as part of their post-remand summary-judgment motions, the parties once again agreed that there were "no issues of material fact." Appellees' Principal Br. 14 (citing Appellees' Suppl. App. at 14 (Precision stated "there remain no factual issues to submit to a jury" and the remaining issue "can only be resolved, as a matter of law, by the Court.")); Appellant's App. vol. 3 at 683 (Lexington agreed that there were no disputes of material fact needing resolved).[9]

Accordingly, the district court resolved the summary-judgment arguments as if the parties had presented evidence at a bench trial. In this situation, we do not apply the ordinary standard of review for summary judgment. This means, contrary to Lexington's position on appeal, that we do not resolve disputed facts in the nonmovant's favor or grant it all favorable inferences. Here, with the parties' agreement, the district court was the ultimate fact finder.

Though we have not yet announced the appropriate standard of review to apply in this circumstance, other circuits have done so. They have concluded that when the district court has decided a case on summary judgment after the parties have waived a trial, the appeals court reviews legal conclusions de novo and factual findings for clear error. We join those circuits and adopt that standard of review. *E.g.*, *Federacion de Empleados del Tribunal Gen. de Justicia v. Torres*, 747 F.2d 35, 36 (1st Cir. 1984)

---

[9] Though Lexington added a "Disputed Material Facts" section to its second motion for summary judgment, it identified no disputed material facts. Instead, Lexington disagreed with Precision's position that Lexington had forfeited the "additional insured" argument.

12

(concluding that the district court's factual inferences could be set aside only if they were clearly erroneous, reasoning that "the parties considered the matter to have been submitted below as a case ready for decision on the merits"); *Satellite Television & Associated Res., Inc. v. Cont'l Cablevision of Va., Inc.*, 714 F.2d 351, 353–54 (4th Cir. 1983) (concluding that because the district court had decided the case "based on affidavits, exhibits and jointly stipulated facts submitted by the parties[,]" the appeals court should review the case "as one tried by the District Court[,]" meaning it could "upset a finding of fact made by the court only if the finding is judged by us to be clearly erroneous"); *Vetter v. Frosch*, 599 F.2d 630, 632 (5th Cir. 1979) (concluding that when a case is essentially a "trial on a stipulated record" all inferences must be drawn "in favor of the district court's decisions which could be reversed on issues of fact only in the event it was found clearly erroneous"); *Starsky v. Williams*, 512 F.2d 109, 111 (9th Cir. 1975) (same).

Here, Precision and Lexington filed cross motions for summary judgment. Both parties submitted additional briefing as requested by the district court. The parties submitted the case to the district court for final resolution on their contested issues of law. The parties stipulated that they did not dispute the underlying facts. So advised, the district court decided the case on its merits. In that circumstance, we review the district court's legal conclusions de novo and its fact findings for clear error.

13

**II.     Precision Is Entitled to Lexington's Additional-Insured Coverage Because Precision's Liability Arises Out of Work Performed by Upstream for Precision.**

**A.     The Scope of Remand Under the Mandate Rule**

In *Precision I*, we acknowledged that our decision "does not fully resolve the parties' dispute." 830 F.3d at 1224. We remanded for the district court to do so, mentioning the additional-insured issue as an example of an issue still needing resolved. *Id.* "[T]he scope of the mandate on remand in the Tenth Circuit is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." *See Dish Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 865 (10th Cir. 2014) (alterations in original) (internal quotation marks omitted) (quoting *United States v. West*, 646 F.3d 745, 749 (10th Cir. 2011)).

As mentioned, the district court initially resolved the case based on Wyoming's anti-indemnity statute. *See Lexington Ins. Co.*, 2014 WL 11515822, at *9. Doing so relieved the district court from deciding the preliminary coverage issue under Lexington's policies. Had the district court reached the coverage issue, it would have seen that Precision had not sufficiently analyzed the additional-insured issue. Nowhere did Precision argue how it was entitled to coverage under Endorsement 17 of the General Policy.[10] Absent Precision's doing so, Lexington had

---

[10] Precision bears the initial burden of establishing it was covered under the Lexington-Upstream policies. *See Hursch Agency, Inc. v. Wigwam Homes, Inc.*, 664 P.2d 27, 31 (Wyo. 1983) ("[T]he insured has the burden of proving that its loss was

14

nothing to respond to on that point. For this reason, as well as our broad mandate in *Precision I*, we agree with Lexington that it did not forfeit its ability to contest coverage, especially under Endorsement 17. In short, we affirm the district court's conclusion that Lexington did not forfeit its argument on additional-insured coverage.

**B.    Precision Is Entitled to Coverage Under Lexington's Policies.**

As we examine the district court's post-remand judgment in favor of Precision on policy coverage, Endorsement 17 of the General Policy takes center stage:

> A. Section II - Who Is An Insured is amended to include any person or organization you are required to include as an additional insured on this policy by a written contract or written agreement[11] in effect during this policy period and executed prior to the "occurrence" of the "bodily injury" or "property damage."

---

due to an insured risk[.]" (citation omitted)); *see also Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008)). If Precision proves coverage, then Lexington bears the burden of establishing an exclusion applies. *See Gilbert Tex. Constr., L.P.*, 262 S.W.3d at 782 ("If the insured proves coverage, then to avoid liability the insurer must prove the loss is within an exclusion.") (citation omitted); *see also Hursch Agency, Inc.*, 664 P.2d at 31.

[11] The Ultra-Upstream Master Service Agreement requires Upstream

> to procure and maintain, at its sole expense, with solvent Insurers and insurers acceptable to [Ultra], policies of insurance in favor of [Ultra], its subsidiary, affiliated and related companies, and their working interest owners, co-lessees, co-owners, contractors and subcontractors and any others for whom any of the foregoing may be acting; and the agents, directors, officers, employees of any one or more of the above named or described parties (hereinafter all collectively referred to as "Company") in the minimum amounts outlined in the Exhibits attached hereto and made a part hereof Exhibit "A" and Exhibit "B".

Appellant's App. vol. 1 at 246, ¶ 3.1.

15

B. The insurance provided to the above described additional insured under this endorsement is limited as follows:
1. COVERAGE A BODILY INJURY AND PROPERTY DAMAGE (Section 1 – Coverages) only.
2. The person or organization is only an additional insured with respect to liability arising out of "your work" or "your product" for that additional insured.

Appellant's App. vol. 1 at 94. The policy further defines "[y]our work" as "[w]ork or operations performed by you [Upstream] or on your behalf[.]" Appellant's App. vol. 1 at 65, 124.

The district court noted that Lexington's entire additional-insured argument depended on its "very specific use of the phrase 'work for.'" *Lexington Ins. Co.*, 2018 WL 8807146, at *6. In evaluating Lexington's argument, the court reviewed what work Upstream had performed at the well site (through its independent contractor, Jent). *Id.* After reciting Jent's management role, including his overseeing safety protocols and helping "Precision's employees operate the drilling rig better to make the well more productive[,]" the court concluded that Upstream performed work (through Jent) "for" Precision. *Id.*

We review de novo a district court's interpretation of policy language. *See Sonnett v. First Am. Title Ins. Co.*, 2013 WY 106, ¶¶ 5–7, 309 P.3d 799, 803–04 (Wyo. 2013); *see also Marathon Ashland Pipe Line LLC v. Maryland Cas. Co.*, 243 F.3d 1232, 1236 (10th Cir. 2001). In Wyoming, courts give insurance policy language its plain meaning. *N. Fork Land & Cattle, LLLP v. First Am. Title Ins. Co.*, 2015 WY 150, ¶ 14, 362 P.3d 341, 346 (Wyo. 2015).

16

Whether Lexington's two policies cover Precision against Jent's claims depends on the meaning of subsection B.2. With the names of the parties inserted, we read this provision as providing Precision coverage as an additional insured when Precision is liable to a third party and the liability arises from work performed by Upstream for Precision. As we weigh this language, we see the two prepositions— "by" and "for"—as particularly important.[12]

In denying coverage, Lexington rests its case on "for."[13] Lexington reads a right-of-control component into that word. From that, it argues that because Upstream, not Precision, had a right to control Jent, his work was "for" Upstream, not Precision. Otherwise stated, Lexington argues that Upstream's work could not be "for" Precision unless Upstream's work was subject to Precision's control. Appellant's Opening Br. 39.

We reject Lexington's position that the word "for" in subsection B.2 requires that Precision have a right to control the work. First, as mentioned, subsection B.2

---

[12] We note that Lexington reads past the "by" and its significance. It misreads subsection B.2 as encompassing Upstream's work performed for Precision. *See* Appellant's Opening Br. 37, 39 ("Endorsement 17 simply limits additional insured coverage to those for whom Upstream performs work."); *id.* at 47 ("Because Upstream did not *perform* work or operations for Precision, Precision is not entitled to *any* additional insured coverage.").

[13] Lexington does not contest Endorsement 17's additional prerequisites to coverage—that Precision qualifies as an additional insured under subsection A above and that Precision's liability to Jent arises from work performed by Upstream (meaning we have no occasion to decide whether Precision's sole negligence as Jent pleaded in his complaint suffices to invoke coverage under Endorsement 17).

17

requires that the work be performed *by* Upstream. That alone requires that Upstream have had the right to control those performing its work. "Work performed *by* Upstream" (Jent's supervision) cannot be work subject to Precision's right of control.[14] Thus, we conclude that reading "for" as Lexington does would render coverage under Endorsement 17 a nullity and result in illusory coverage. *See Lexington Ins. Co.*, 2018 WL 8807146, at *6 ("Lexington attempts to construe the phrase 'work for' in such a limited and tortured way that it would thwart the general object of the Lexington Policies.").

The district court concluded that Jent had acted "for" Precision after noting that Jent had "performed some level of safety oversight on the drilling rig and actively tried to help Precision's employees operate the drilling rig better to make the well more productive." *Id.* For several reasons, we agree with this approach and interpret work "by" Upstream "for" Precision as including work "on behalf of" Precision.

First, Jent was supervising the disassembly of *Precision's* valuable property—the drilling rig. He supervised to help ensure the safety of Precision's rig and employees. Second, the record reveals that Jent was not an unwelcome interloper thrust on Precision, but a key part of Precision's efforts. Jent's expertise is

---

[14] Jent acknowledged that he was employed by Upstream at Ultra's request, and that Upstream paid him. Jent was Upstream's representative at the well site. Lexington acknowledges that Upstream controlled Jent's work. *See* Appellant's App. vol. 3 at 689 ("Upstream retained Jent to fulfill Upstream's obligations to Ultra under the Ultra-Upstream contract.").

uncontroverted—he had "conducted a rig down more than 20 times." Appellant's App. vol. 1 at 207. Third, Precision had already dropped a rig during a rig-down operation. Jent attributed that failure to Precision's having improperly placed that rig's pins, and he wanted to ensure that this did not happen again. Fourth, Jent worked with the Precision employees to prevent workers from being hit by flying pins when standing in the wrong place. For whose benefit was the work performed by Upstream (Jent's supervision) done? For Precision's benefit.

Further, even if we determined that "for" as used in Endorsement 17, subsection B.2 was somehow susceptible to two meanings, we would resolve the ambiguity in Precision's favor, not Lexington's. *Century Sur. Co. v. Jim Hipner, LLC*, 2016 WY 81 ¶ 5, 377 P.3d 784, 787 (Wyo. 2016) ("Where the terms [of an insurance policy] are ambiguous, they are strictly construed against the insurer . . . because insurance policies are contracts of adhesion where 'the insured has little or no bargaining power to vary the terms.'" (quoting *N. Fork Land & Cattle, LLLP*, ¶ 14, 362 P.3d at 346)); *see also Marathon Ashland Pipe Line LLC*, 243 F.3d at 1241–42 (concluding that ambiguous policy language must be interpreted in favor of the additional insured).

### III.     Lexington Is Responsible to Cover the Entire $3 Million Settlement.

After our remand, Lexington filed a motion for summary judgment, contending for the first time that Endorsement 3 of the Umbrella Policy sets Lexington's policy limits at $2 million. In its pre-remand summary-judgment motion, Precision sought reimbursement for the full amount of the Jent settlement—$3 million. Back then,

19

Lexington raised no policy-limits defense, all through the first appeal. After remand, the district court ruled that Lexington had forfeited its newly made policy-limits argument because "Lexington did not mention the issue of maximum coverage in their filings related to the first cross motions for summary judgment, nor did they mention it before the [Tenth] Circuit[.]" *Lexington*, 2018 WL 8807146, at *4. The district court noted that Lexington was itself raising the policy-limits argument, not simply responding to a Precision argument (as Lexington was responding to Precision's additional-insured-coverage argument). *Id.* at *3. On appeal, Lexington argues that it did not forfeit this argument and that by ruling otherwise, the district court legally erred by increasing the policy limits beyond what the policy allowed. We now turn to that argument.

We choose not to consider the district court's forfeiture ruling, because even if it erred, Lexington would still lose. For the reasons below, we conclude that the policy limits exceed the $3 million judgment.

The General Policy contains a $1 million "Each Occurrence" limit. The Umbrella Policy contains a $5 million "Each Occurrence" limit. The Umbrella Policy's Endorsement 3, deletes and replaces that policy's "Section IV - Limits of Insurance." Appellant's App. vol. 1 at 132. Two sections of Endorsement 3 are important. First, subsection B sets the Umbrella Policy's limits at $5 million. *Id*. But Endorsement 3 further limits the amount of coverage if the conditions of subsection D apply. That subsection reads as follows:

[T]he most we will pay for damages under this policy on behalf of any person or organization to whom you are obligated by a written *"insured contract"* to provide insurance such as is afforded by this policy is the lesser of the limits of insurance shown in Item 3 of the Declarations or the minimum limits of insurance you agreed to procure in such written "insured contract."

*Id.* (emphasis added). So to decrease the policy limits under subsection D, Lexington must show that an "insured contract" requires a lesser amount than $5 million. Here is the $1 million-dollar question (whether policy limits here are $2 million or $3 million): Is there an "Insured Contract" requiring $2 million in coverage, not more?

The Umbrella Policy resolves this question with its definition of "Insured Contract":

"Insured Contract" means that part of any contract or agreement pertaining to your business under which any "Insured" assumes the tort liability of another party to pay for "bodily injury" or "property damage" to a third person or organization. Tort liability means a liability that would be imposed by law in the absence of any contract or agreement.

*Id.* at 120. We read "Insured Contract" as an indemnity contract. An indemnitor assumes another's tort liability to an injured party. Here, the Master Service Agreement has a paragraph titled "Indemnity," but nothing in that paragraph requires Upstream (or anyone else) to obtain insurance. That requirement comes in a separate paragraph (and thus in a non-"Insured Contract" part of the Master Service Agreement) titled "Insurance." So circling back to Endorsement 3, subsection D, Lexington cannot show that the Master Service Agreement's indemnity provision (so its "insured contract" provision) requires Upstream "to provide insurance as is provided by this policy." Thus, the policy limits are $1 million under the General

21

Policy and another $5 million under the Umbrella Policy. *See Coleman Co. v. Cal.*

*Union Ins. Co.*, 960 F.2d 1529, 1530 n.1 (10th Cir. 1992) (concluding that umbrella

insurance "provides standard excess coverage that attaches after a predetermined

amount of primary coverage has been exhausted" (citations omitted)); *see also*

Appellant's App. vol. 1 at 30 ("The . . . Umbrella Policy contains a limit of

$5,000,000 . . . upon exhaustion of all coverage available under the . . . Primary

Policy."). Accordingly, we affirm the district court's judgment in the amount of $3

million.[15]

We acknowledge having struggled with this question. After all, we understand

that a more-expansive reading of "insured contract" could include both indemnity

and insurance on behalf of another party's liability. Further, doing so would fit with

subsection D's language reading "to provide insurance such as is afforded by this

policy." But Lexington drafted the policy language and defined "insured contract" as

it did. If it meant Endorsement 3, subsection D, to reach insurance agreements as

required by the Master Service Agreement it simply had to tie that to a term other

than "insured contract." For now at least, Lexington has to live with its language.

*Shaffer v. WINhealth Partners*, 2011 WY 131, ¶ 10, 261 P.3d 708, 711 (Wyo. 2011)

(internal quotation marks and citations omitted ("[T]he parties have the right to employ

---

[15] If Endorsement 3, subsection D had applied, the policy limits would have been $2 million. The Master Service Agreement's Exhibit B required Upstream to procure a minimum of $1 million in "Comprehensive General Liability" insurance and a minimum of $1 million in "Excess Liability" insurance. Appellant's App. vol. 2 at 356.

whatever lawful terms they wish and courts will not rewrite them.")). And as discussed earlier, even if we read "insured contract" as subject to two meanings, we would still construe "insured contract" against Lexington as the drafter. *See Century Sur. Co.*, ¶ 5, 377 P.3d at 787; *Marathon*, 243 F.3d at 1241–42.

**IV.** **Precision Is Not Entitled to an Award of Prejudgment Interest or Attorneys' Fees.**

The final issue is whether the district court properly denied Precision's request for prejudgment interest and attorneys' fees. We review a district court's denial of prejudgment interest "for an abuse of discretion." *Malloy v. Monahan*, 73 F.3d 1012, 1019 (10th Cir. 1996) (citing *Zuchel v. City & Cty. of Denver, Colo.*, 997 F.2d 730, 746 (10th Cir. 1993)). As support for its position, Precision relies on Wyo. Stat. Ann. § 26-15-124(c) (2018). In response, Lexington argues that this statute affords Precision no relief because it issued the policies in Texas, not in Wyoming as the statute requires. Precision does not address the substance of Lexington's argument but rather asserts that Lexington has forfeited this defense by not raising it in its pre-remand motion for summary judgment.

We again turn to the *Precision I* mandate. Because this court resolved only the anti-indemnity issue in the previous appeal, we did not consider the prejudgment interest and attorneys' fees issue. *See generally Precision I*, 830 F.3d 1219. Our mandate in *Precision I* was broad. *See id.* at 1224. Aside from acknowledging that the district court had not yet decided "[b]y way of example only . . . whether Precision qualifies as an additional insured under the Lexington policies[,]" we

23

provided no other guidance or limitations for remand. *See id.* Consistent with this court's precedent, "the district court [was] to look to the mandate for any limitations on the scope of the remand and, in the absence of such limitations, exercise discretion in determining the appropriate scope." *See West*, 646 F.3d at 749. Because we did not provide any limitations, the district court properly exercised its discretion in considering Lexington's argument. As such, we do no violence to the mandate rule by considering that argument now.

Addressing the merits of the issue, we agree with Lexington that Precision obtains no relief from § 26-15-124. Section 26-15-101 lays out the scope of Wyoming's insurance code. This statute allows prejudgment interest and attorneys' fees for "all insurance contracts and annuity contracts *except*: . . . (ii) Policies or contracts not issued for delivery in this state nor delivered in this state[.]" *Id.* (emphasis added). The Lexington policies were issued in Texas, so the Wyoming insurance code, including § 26-15-124, is inapplicable.

Precision also fails to show that Lexington's refusal to reimburse Precision for the Jent settlement was unreasonable or without cause as required by § 26-15-124(c). Though it initially agreed to defend Precision, Lexington withdrew its defense prior to the settlement, refused to reimburse Precision and Lloyd's for the settlement, and instead sought a declaration that it had no obligation to reimburse Precision for the settlement because of Wyoming's anti-indemnity statute. Precision contends this was without cause. Precision largely hangs its argument on our prior rejection of Lexington's anti-indemnity statute argument. But just because we reversed the

24

district court's ruling, that does not by itself render Lexington's actions per se without cause or unreasonable. The district court made no finding that Lexington's actions were unreasonable or without cause, as required by the statute, and we decline to do so here.

Lexington had a cogent argument for seeking declaratory judgment that it was not liable to reimburse Precision for the settlement with Jent. This argument is one that other jurisdictions have accepted. *See Precision I*, 830 F.3d at 1221 (this court did not find it persuasive that Oklahoma, Colorado, and Kansas have enacted statutes expressly providing support for Lexington's argument). Lexington, although ultimately unsuccessful, argued that reimbursing Precision's settlement payment would amount to an indemnity action, which Wyoming's anti-indemnity statute would bar. The district court found this argument plausible and in fact ruled in its favor on the issue.

Though we ultimately reversed that ruling, two different interpretations of statutory language, with one ultimately being unsuccessful, does not create an unreasonable withholding of payment. *Paulino v. Chartis Claims, Inc.*, 774 F.3d 1161, 1164 (8th Cir. 2014) ("[T]he fact that the insurer's position is ultimately found to lack merit is not sufficient by itself to establish the first element of a bad faith claim. Rather, the focus is on the existence of a debatable issue, not on which party was correct." (internal quotation marks, alterations, and citations omitted)).

Because Precision fails to show that the district court abused its discretion and fails to adequately show that Lexington unreasonably or without cause withheld

25

payment, we affirm the district court's holding that Precision is not entitled to prejudgment interest or attorneys' fees under § 26-15-124(c).

On appeal, for the first time, Precision argues alternatively that it is entitled to prejudgment interest under the common law. We disagree. Precision contends that it preserved this issue by requesting common-law prejudgment interest in both rounds of summary judgment. But we see nothing there except a request for statutory prejudgment interest. For instance, in the first round of summary judgment, Precision states that it is entitled to recover interest "at the rate of ten percent." Appellant's App. vol. 1 at 243. As Precision acknowledges, Wyoming provides a statutory rate of ten percent for prejudgment interest, while common law provides for a seven percent rate. We disagree that Precision sought prejudgment interest under both the Wyoming statutes and its common law. The "Proposed Findings Of Fact and Conclusions of Law" also requests only statutory interest, failing to mention common-law interest.

In Precision's second round of summary-judgment briefing, it requested ten percent prejudgment interest under § 25-12-124(c), again without mentioning any common-law right. In its reply brief in its second round of summary-judgment motions, Precision included a single sentence generally asserting that the court has "independent discretion to award [Precision] pre-judgment interest." Appellant's App. vol. 3 at 727. But it later requested prejudgment interest of ten percent. A single, vague request for interest in a reply brief only, followed by a reference to statutory prejudgment interest does not suffice. Because Precision failed to request common-law interest until this appeal, Precision has waived that argument. We agree

26

with the district court's denial of Precision's request for prejudgment interest and attorneys' fees.

## CONCLUSION

For the above reasons, we affirm the district court.